# IN THE SUPREME COURT OF TEXAS

═══════════

No. 10-0887

═══════════

WENDELL REEDER, PETITIONER

v.

WOOD COUNTY ENERGY, LLC, WOOD COUNTY OIL & GAS, LTD., NELSON
OPERATING, INC., DEKRFOUR, INC., BOBBY NOBLE, EXZENA OIL CORPORATION,
DAVID FRY AND PATRICIA FRY, RESPONDENTS

══════════════════════════════════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE TWELFTH DISTRICT OF TEXAS

══════════════════════════════════════════════════════════

Argued February 27, 2012

JUSTICE WAINWRIGHT delivered the opinion of the Court.

This case involves the duties and standard of care of an oil and gas operator under an exculpatory clause in a joint operating agreement (JOA). The language of the exculpatory clause in the JOA exempts the operator from liability for activities under the agreement unless it arises from gross negligence or willful misconduct. Based on that language in the exculpatory clause, the trial court instructed the jury that to find a breach of the JOA the operator's conduct must have risen to the level of gross negligence or willful misconduct. The jury found that the operator, Petitioner Wendell Reeder (Reeder), breached his duties under the JOA to the working interest owners. The trial court signed a final judgment that Reeder take nothing on his claims for exclusive possession

of the wellbores, and instead awarded damages to Patricia Fry, Dekrfour, Inc., Nelson Operating, Inc., Bobby Noble, Wood County Energy, LLC, and Wood County Oil & Gas, Ltd.[1]

The court of appeals disagreed that the exculpatory clause applies to the claims, holding that the "standard[] of care provided in the exculpatory clause do[es] not apply to what this case was all about—a breach of contract. Thus, the gross negligence and willful misconduct instruction should not have been included in the charge." 320 S.W.3d 433, 444.

We decide whether 1) the exculpatory clause in the JOA applies to the claims against Reeder, and if so, 2) whether there is legally sufficient evidence that Reeder was grossly negligent or acted with willful misconduct. We hold that the clause applies to the claims against Reeder. Because there is legally insufficient evidence that Reeder acted with gross negligence or willful misconduct, we reverse the judgment of the court of appeals.

## Background Facts and Procedural History

The Forest Hill Field in Wood County encompasses two oil-bearing formations, the Sub-Clarksville Unit and the Harris Sand Unit. The two units overlap, and oil was being produced from both units. Through his company, Dekrfour, Inc. (Dekrfour), David Fry bought a working interest in the Sub-Clarksville Unit. The next year Dekrfour entered into a mutual agreement with Secondary Oil Corporation (Secondary) and the mutual agreement became part of a JOA that the parties executed eleven days later. *Id.* at 439. Under the JOA, Dekrfour, Secondary, and Secondary's sister

---

[1] Wood County Energy, LLC and Wood County Oil & Gas, Ltd. no longer wish to prosecute any claims in this lawsuit or to execute on or otherwise enforce any judgment in their names. They consider their claims resolved and we do not address any of their claims in this opinion. Bobby Noble passed away during the pendency of this appeal and his wife is the estate's independent executrix pursuing this appeal on his behalf. *See* TEX. R. APP. P. 7.1(a)(1).

corporation would share the existing wellbores in the production of the Sub-Clarksville and the Harris Sand Units. Dekrfour transferred an 85% working interest to Secondary, transferred a 10% carried working interest to Nelson Operating, Inc. (Nelson), another of David Fry's companies, and transferred its interest in all other formations in the wells to Nelson. Wendell Reeder became the operator of the Harris Sand Unit when he and Don Dacus purchased 87.5% of the working interest in the unit wells previously transferred to Secondary. Reeder then formed a limited partnership, Wood County Oil and Gas, Ltd. (Wood County), with James Wade and Hattie Scherbach in which Reeder and Wade each owned 45% and Scherbach owned 10%.

Reeder continued to act as operator, but the relationship with his partners and David Fry became strained. Reeder alleged that four wells required expensive testing or repairs and he sought funding from Wood County. Wade, as President of Wood County, denied his requests. Reeder claims that because those repairs were not made, the Texas Railroad Commission (Commission) severed the Harris Sand Unit and eventually suspended its production. Reeder alleges that he spent at least $150,000 of his own money in an attempt to pay bills and preserve operations.

In May 2004, Reeder filed suit against Dekrfour, Nelson, and Bobby Noble (collectively the "Fry Interests"),[2] asserting he was the operator and had the exclusive right of possession of the wellbores for the purpose of producing oil. *Id*. at 440. Reeder sued on claims of trespass, ouster, conversion, violation of the Theft Liability Act, physical damage to existing wells, and sought both declaratory and injunctive relief.

---

[2] In April 2003, Bobby Noble purchased a portion of Dekrfour's and Nelson's Sub-Clarksville interest. Noble aligned himself with Dekrfour and Nelson throughout the trial, and he is, therefore, included in the "Fry Interests." 320 S.W.3d at 439 n.2.

The Fry Interests filed a counterclaim against Reeder, alleging that Reeder "illegally produced oil from the Sub-Clarksville formation" and "fraudulently reported it as production from the Harris Sand Unit to the Railroad Commission." They claimed that Reeder removed oil and concealed production in the Harris Sand Unit, giving rise to claims for conversion and violations of the Theft Liability Act. They alleged that Reeder failed to obtain production in paying quantities, as required by the JOA, and converted their personal property. Patricia Fry alleged that she had been fined by the Commission because Reeder failed to file a document with the Commission. They claimed that while Reeder promised to comply with the Commission and get the unit producing again, he did nothing.

Wood County later asserted that if the Fry Interests suffered any damages, those damages were caused by Reeder as operator of the Harris Sand Unit. *Id*. Wood County filed a cross claim against Reeder, seeking damages for his actions as operator, lost leases, and loss of the unit. Wood County also nonsuited its damages claims against the Fry Interests but continued to seek declaratory relief. Reeder's partner Wade asserted that he invested time and money to increase production, only to have Reeder squander the effort, knowing that he would cause the loss of millions of dollars worth of valuable leasehold rights.

The case proceeded to trial, and a jury found that Reeder breached his duty as operator "by failing to maintain production in paying quantities or other operations in the Forest Hill Field." The trial court entered a final judgment ordering Reeder take nothing, awarding damages to Dekrfour, Nelson, Noble, Patricia Fry, and Wood County, and declaring that Reeder owned no mineral interest in the leases covering the Harris Sand Unit or the Sub-Clarksville Unit.

4

Reeder timely appealed the damages award against him, raising seventeen issues challenging the trial court's conclusion that he was bound by the JOA, the jury's findings that he breached the JOA, and the award of damages. *Id*. at 439. The court of appeals disagreed that the exculpatory clause applied to the claim, instead holding that the gross negligence and willful misconduct instruction should not have been included in the charge. *Id*. at 444. The court of appeals held that the evidence is legally and factually sufficient to support the jury's findings that Reeder breached his duty as operator when measured against the elements of breach of contract. *Id*. at 452–53. The court also held that the evidence is legally and factually sufficient to support the damage awards, but held that the trial court's judgment did not conform to the jury's damage awards. *Id.* at 453.

The court of appeals affirmed the trial court's judgment but modified the prejudgment interest, suggested a remittitur in attorneys' fees, and conformed the damage awards to the jury's findings. *Id*. Reeder filed a petition for review with this Court challenging the court of appeals' judgment.

## Discussion

### A. Applicability of the Joint Operating Agreement's Exculpatory Clause

We begin by deciding whether the exculpatory clause in the JOA sets the standard to adjudicate the breach of contract claims against Reeder. An exculpatory clause is a "clause in a contract designed to relieve one party of liability to the other for specified injury or loss incurred in the performance of the contract." Howard Williams & Charles Meyers, *Manual of Oil and Gas Terms* 372, 373 (12th ed. 2003, updated and revised by Patrick Martin & Bruce Kramer); *see, e.g., Interstate Contracting Corp. v. City of Dallas*, 135 S.W.3d 605, 612–13 (Tex. 2004); *Dresser Indus.,*

5

*Inc. v. Page Petroleum, Inc.,* 853 S.W.2d 505, 507 n.1, 508–11 (Tex. 1993); *Tex. Gas Utils. Co. v. Barrett*, 460 S.W.2d 409, 413 (Tex. 1970). The court of appeals held that this exculpatory clause does not apply to the breach of contract claims and, therefore, the gross negligence and willful misconduct instructions should not have been included in the jury charge. 320 S.W.3d at 444. Reeder argues, however, that the operator's exculpatory clause must be interpreted as written.

The exculpatory clause in the JOA provides, in relevant part:

Operator shall conduct its activities under this agreement as a reasonable prudent operator, in a good and workmanlike manner, with due diligence and in accordance with good oilfield practice, but in no event shall it have any liability as Operator to the other parties for losses sustained or liabilities incurred except such as may result from gross negligence or willful misconduct.

In a prior case, the court of appeals considered a similar exculpatory clause and saw "no meaningful difference between the two exculpatory clauses." *Id.* (citing *Castle Tex. Prod. Ltd. P'ship v. Long Trusts*, 134 S.W.3d 267, 283 n.4 (Tex. App.—Tyler 2003, pet. denied)). The similar exculpatory clause from the prior case reads, in relevant part:

[Operator] . . . shall conduct and direct and have full control of all operations on the Contract Area as permitted and required by, and within the limits of, this agreement. It shall conduct all such operations in a good and workmanlike manner, but it shall have no liability as Operator to the other parties for losses sustained or liabilities incurred, except such as may result from gross negligence or willful misconduct.

*Id.* (citing *Long Trusts*, 134 S.W.3d at 283 n.4). The court of appeals noted that the exculpatory clause in this case contains the phrase "its activities under this agreement" while the contract in the prior case used the terms "all such operations." *Id.* The court of appeals nevertheless held that the exculpatory clause applies only to claims that Reeder breached his duty in operations and not to

6

claims that he otherwise breached the JOA, because the clause is located within the paragraph describing "operations on the contract area." *Id*.

Other courts of appeal have similarly considered the previous exculpatory clause language requiring the operator to "conduct all such operations in a good and workmanlike manner." Those courts of appeal have held that the clause extends only to claims that the operator failed to act as a reasonably prudent operator for operations under the contract, and not for other breaches of the JOA. *See, e.g., Long Trusts*, 134 S.W.3d at 267; *IP Petroleum Co., Inc. v. Wevanco Energy, L.L.C.*, 116 S.W.3d 888 (Tex. App.—Houston [1st Dist.] 2003, no pet.); *Cone v. Fagadau Energy Corp.*, 68 S.W.3d 147 (Tex. App.—Eastland 2001, pet. denied); *Abraxas Petroleum Corp. v. Hornburg*, 20 S.W.3d 741 (Tex. App.—El Paso 2000, no pet.). In *Abraxas*, the court of appeals held that "the operator's limitation of liability is linked directly to imposition of the duty to act as a reasonably prudent operator, which strictly concerns the manner in which the operator conducts drilling operations on the lease." 20 S.W.3d at 759. The court held that "the exculpatory clause is limited to claims based upon an allegation that Abraxas failed to act as a reasonably prudent operator and does not apply to a claim that it breached the JOA." *Id*.

The Fifth Circuit analyzed the same language and stated, contrary to the direction of the courts of appeal, that the clause's "protection clearly extends to breaches of the JOA." *Stine v. Marathon Oil Co.*, 976 F.2d 254, 261 (5th Cir. 1992). "It is clear to us that the protection of the exculpatory clause extends not only to 'acts unique to the operator,' as the district court expressed it, but also to any acts done under the authority of the JOA 'as Operator.'" *Id*. The Court held that

7

the clause protects Marathon from liability "for any act taken in its capacity as 'Operator' under the JOA (except for gross negligence or willful misconduct)." *Id*.

The exculpatory clauses that the courts of appeal and the Fifth Circuit considered were modeled after either the 1977 or 1982 Model Form Operating Agreement of the American Association of Petroleum Landmen. The exculpatory clause in the 1977 Model Form JOA stated that operator "shall conduct all such operations in a good and workmanlike manner . . . ." A.A.P.I. Form 610, Model Form Operating Agreement-1977, American Association of Petroleum Landmen, at 3. The 1982 Model Form provided that operator "shall conduct all such operations in a good and workmanlike manner," mirroring the language from the 1977 Model Form JOA. A.A.P.I. Form 610, Model Form Operating Agreement-1982, American Association of Petroleum Landmen, at 4. The cases limiting the scope of the exculpatory clauses in JOAs were interpreting language in either the 1977 Model Form JOA or the 1982 Model Form JOA. *See, e.g.*, *Abraxas*, 20 S.W.3d at 758–59 (construing "shall conduct all such operations" and holding that clause does not extend to claims that operator breached the JOA); *Long Trusts,* 134 S.W.3d at 283 (construing "shall conduct all such operations" and applying *Abraxas*); *IP Petroleum*, 116 S.W.3d at 894–96 (construing "shall conduct such operations," and applying *Abraxas*)*; Cone*, 68 S.W.3d at 154–55 (construing "shall conduct all such operations" and applying *Abraxas*).

The exculpatory clause in this case, however, is taken from the 1989 Model Form JOA, referring to "its activities under this agreement" instead of "all such operations." A.A.P.I. Form 610, Model Form Operating Agreement-1989, American Association of Petroleum Landmen. Legal commentators conclude there is a meaningful difference in the change in language from "all such

operations" to "its activities."  "By way of contrast, the 1982 Form and prior forms differ markedly

. . . .  Because 'such operations' refers to operations on the Contract Area, the 1989 Form provides

for more expansive exoneration of the Operator."  Robert C. Bledsoe, *The Operating Agreement:*

*Matters Not Covered or Inadequately Covered*, 47 ROCKY MTN. MIN. L. INST. § 15.03[1] (2001).

Under the 1977 agreement, the language "conduct all such operations" applied to activities

conducted by an operator on the "Contract Area" or at the well site, but "the 1989 [version] language

seems to provide a broader spectrum of coverage."  Wilson Woods, Comment, *The Effect of*

*Exculpatory Clauses in Joint Operating Agreements: What Protections Do Operators Really Have*

*in the Oil Patch?*, 38 TEX. TECH. L. REV. 211, 214–15 (2005).

 "In construing a written contract, the primary concern of the court is to ascertain the true

intentions of the parties as expressed in the instrument."  *Valence Operating Co. v. Dorsett*, 164

S.W.3d 656, 662 (Tex. 2005) (citations omitted).  To achieve this objective, contract terms are given

"their plain and ordinary meaning unless the instrument indicates the parties intended a different

meaning."  *Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex.

2009) (citation omitted).

 Reading the clause as written, we conclude that the model form transformation is significant,

as the change in language broadens the clause's protection of operators.  The model forms from 1977

and 1982 both contained clauses that protected operators from "all such operations," while the 1989

model form protects "its activities."  Here, the parties modeled their JOA after the 1989 model

form—recognizing the distinction between "such operations" and "its activities."  The modifier

"such" references operations under the JOA, while the deletion of that word and use of the term "its

9

activities" includes actions under the JOA that are not limited to operations. The modification implicates a broader scope of conduct following the language of the contract. The agreed standard exempts the operator from liability for its activities unless its liability-causing conduct is due to gross negligence or willful misconduct.

**B. Legal Sufficiency of the Evidence of Gross Negligence or Willful Misconduct**

We turn next to determine whether there is legally sufficient evidence that Reeder was grossly negligent or acted with willful misconduct. Reeder argues that there is no evidence that gross negligence or willful misconduct caused the loss of production in paying quantities, and terminated the leases. The court of appeals held that the exculpatory clause did not apply to the claims addressed by the breach of contract Questions 8 and 18,[3] and therefore measured legal and factual sufficiency against the elements of breach of contract, not gross negligence or willful misconduct. 320 S.W.3d at 444.

In reviewing a verdict for legal sufficiency, we "must view the evidence in the light most favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *City of Keller v. Wilson*, 168 S.W.3d 802, 807 (Tex. 2005). A legal sufficiency challenge will be sustained when, inter alia, the evidence offered to prove a vital fact is no more than a mere scintilla. *Volkswagen of Amer., Inc. v. Ramirez,*

---

[3] Question 8 asks: "Do you find that Wendell Reeder breached his duty as operator to Dekrfour, Inc., Nelson Operating, Inc. and/or Wood County Oil & Gas Ltd. by failing to maintain production in paying quantities or other operations in the Forest Hill Field?" Question 18 asks: "Do you find that Wendell Reeder breached his duty to Dekrfour, Inc., Nelson Operating, Inc., and/or Wood County Oil & Gas, Ltd., by failing to offer Well No. 116 to them prior to plugging the well?"

10

159 S.W.3d 897, 903 (Tex. 2004) (citing *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)).

Reeder challenges the jury's affirmative answers and the court of appeals' holding that he breached his duty as operator. The jury was given the same instruction to Questions 8 and 18 regarding his duty as operator:

> You are instructed that the joint operating agreement requires the Operator to conduct operations in a good and workmanlike manner. A good and workmanlike manner requires the operator to act as "a reasonably prudent operator."

> You are further instructed that the Operator is not liable under this standard unless Operator's conduct amounts to gross negligence or willful misconduct.

> You are further instructed that "gross negligence" means that entire want of care which would raise the belief that the act or omission complained or [sic] was a result of a conscious indifference to the right or welfare of the person or persons to be affected by it.

320 S.W.3d at 443. In holding that the exculpatory clause did not apply to the claims against Reeder, the court of appeals measured the sufficiency of the evidence against the elements of breach of contract. *Id*. at 444–45.

On appeal, Reeder contended that the evidence is legally and factually insufficient to support the jury's answer to Question 8 that he breached his duty as operator by failing to maintain production in paying quantities or other operations in the Forest Hill Field. *Id*. at 445. The court held that his challenge was without merit because there was some evidence that Reeder did not maintain production in paying quantities or take necessary action to maintain the leases. *Id*. at 446.

11

The court reasoned that it need not address Reeder's arguments regarding the gross negligence and willful misconduct standards. *Id*.

Because the exculpatory clause applies to these claims, however, our task is to determine whether there is legally sufficient evidence that Reeder acted with gross negligence or willful misconduct in breaching his duty as operator. The parties agreed by the language of the JOA that liability for a failure to perform contractual obligations requires more than a mere breach; rather, it requires a breach attended by gross negligence or willful misconduct. The jury was properly instructed. But we disagree that there is legally sufficient evidence to support the proper standard. The court of appeals emphasized that the "evidence shows that Reeder had no production from the Harris Sand Unit from September 2006 forward and that production had begun declining precipitously in the preceding months." *Id*. Further, "Reeder presented no evidence of any actions he undertook or other operations he attempted that would maintain the leases and the unit." *Id*.

Gross negligence has both an objective and a subjective component. *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 21–22 (Tex. 1994) (citation omitted). In examining proof of the subjective component, courts focus on the defendant's state of mind, examining whether the defendant knew about the peril caused by his conduct but acted in a way that demonstrates he did not care about the consequences to others. *Diamond Shamrock Ref. Co., L.P. v. Hall*, 168 S.W.3d 164, 173 (Tex. 2005) ("[T]he plaintiff must show that the defendant knew about the peril, but his acts or omissions demonstrate that he did not care."); *Tex. Dept. of Parks and Wildlife v. Miranda*, 133 S.W.3d 217, 232 (Tex. 2004) (citation omitted). Determining whether an act or omission involves peril requires

12

"an examination of the events and circumstances from the viewpoint of the defendant at the time the events occurred, without viewing the matter in hindsight." *Moriel*, 879 S.W.2d at 23.

The court of appeals noted that Reeder testified that he maintained production as long as he could before he had to spend his money on other pressing business interests that he owned and admitted to his partners that he did not have the money to fund his share of the operations. 320 S.W.3d at 446. The Fry Interests point to Reeder's absence from the well-sites, Reeder's failure to file a form with the Commission after he assumed duties as operator, the Commission's severance of the Harris Sand and Sub-Clarksville Units due to failed fluid tests for certain wells, and the cessation of production in September 2006 as examples of Reeder's gross negligence and willful misconduct. We consider this evidence in the context of the entire record for evidence of gross negligence or willful misconduct. *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917, 922 (Tex. 1998) (citing *Moriel*, 879 S.W.2d at 25 (further citation omitted)); *see City of Keller*, 168 S.W.3d at 817; *see also Burk Royalty Co. v. Walls*, 616 S.W.2d 911, 922 (Tex. 1981) ("In determining whether there is some evidence of the jury's finding of gross negligence, the reviewing court must look to all of the surrounding facts, circumstances, and conditions, not just individual elements or facts.").

The Operating Agreement expressly forbade Reeder from "undertak[ing] any project" expected "to cost more than $5,000," except in emergencies. Reeder was notified that remaining wells required testing and repairs, costing well in excess of $5,000, but he could not authorize the repairs without the consent of the other owners. Reeder testified that his partners Wade and Scherback refused his request for additional funding for the repairs. Fry testified that Reeder should have made his partners pay for the repairs, but Reeder testified that he tried and was rebuffed.

Reeder testified that he "put in [$]154,000" of his own money to bring the wells back into compliance with Commission requirements before running out of funds. An act or omission that is merely ineffective, thoughtless, careless, or not inordinately risky is not grossly negligent. *Moriel*, 879 S.W.2d at 22. "Only if the defendant's act or omission is unjustifiable and likely to cause serious harm can it be grossly negligent." *Id*. After reviewing the record, we find no evidence that Reeder knew about the peril but did not care about the consequences.

Reeder also contended on appeal that the evidence is legally and factually insufficient to support the jury's answer to Question 18 that he breached a duty with gross negligence or willful misconduct to Dekrfour, Nelson, and Wood County by failing to offer Well No. 116 to them prior to plugging the well. 320 S.W.3d at 446. Reeder argued that he was ordered to plug the well by the Commission and that he neither elected to abandon nor plug the well. *Id*. at 447. The court of appeals did not address Reeder's argument that the evidence is legally and factually insufficient to support a finding that his actions amounted to gross negligence or willful misconduct, but found that the evidence was legally and factually sufficient to support the elements of a breach of contract. *Id*. at 447–48. That may be so, but we find no evidence that Reeder acted with gross negligence or willful misconduct when he breached a duty to offer Well No. 116 prior to plugging the well.

### Conclusion

Because the parties modeled their joint operating agreement after the revised exculpatory clause in the 1989 Form, the operator is exempted from liability for activities under the agreement unless the liability arises from gross negligence or willful misconduct. We hold that the exculpatory clause establishes the standard for the claims against Wendell Reeder. Because there is legally

14

insufficient evidence that Reeder acted with gross negligence or with willful misconduct, we reverse the judgment of the court of appeals and render a take-nothing judgment.

_____
Dale Wainwright
Justice

**OPINION DELIVERED:** August 31, 2012