**Paula Kaye TURNER and Timothy Ray Turner, Appellants**

v.

**Jennifer DUGGIN, Appellee**

No. 06-16-00046-CV

Court of Appeals of Texas, Texarkana.

Date Submitted: February 2, 2017

Date Decided: March 31, 2017

1. From Deen's testimony, it appears a murder charge against him was presented to the grand jury, but he was not indicted.

**476**

Michael A. Yanof, Cassie J. Dallas, Thompson, Coe, Cousins & Irons, LLP, 700 North Pearl St, 25th Floor, Dallas, TX 75201 for Appellant.

Brian W. Butcher, Noteboom—The Law Firm, 669 Airport Frwy, Ste 100, Hurst, TX 76053, for Appellee.

Before Morriss, C.J., Moseley and Burgess, JJ.

## OPINION

Opinion by Justice Moseley

Oscar was an eleven-year-old blue heeler mix canine owned by Timothy Ray Turner and his wife, Paula Kaye Turner. While the Turners were away on vacation, Oscar escaped their yard through a gate inadvertently left open by Paula's teenaged daughter, Makayela Fuller, and bit passerby Jennifer Duggin, causing her significant and irreparable injury. Duggins brought suit wherein she alleged that the Turners were negligent in the supervision and confinement of the dog (including negligent entrustment of that responsibility to a child), in exercising ordinary care by allowing the dog to escape the Turners' property, and in training the dog to be vicious and to attack people. They alleged that the Turners knew or should have known of the vicious propensities of the dog and were guilty of such gross negligence that they were strictly liable for the damages occasioned to Duggin by the attack. After hearing evidence that Oscar had bitten several other people and regularly escaped the Turner's yard, the jury found by clear and convincing evidence that the Turners had been grossly negligent. The jury awarded a total of $570,000.00 in compensatory damages, $75,000.00 in exemplary damages against Timothy, and $50,000.00 in exemplary damages against Paula. After overruling the Turners' motion for new trial and motion for remittitur, the trial court entered a final judgment in accord with the jury's verdict, adding an award of $5,731.51 in prejudgment interest, for a total award of $700,731.51 to Duggin.

On appeal,[1] the Turners question whether the evidence was legally and factually sufficient to support (1) the jury's award of

1. Originally appealed to the Second Court of Appeals in Fort Worth, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts. See Tex. Gov't Code Ann. § 73.001 (West 2013). We follow the precedent of the Second Court of Appeals in deciding this case. See Tex. R. App. P. 41.3.

$350,000.00 for a line item that included both future pain and suffering and future mental anguish, (2) the jury's finding of gross negligence, and (3) both the award of and the amount of the award of exemplary damages. Because we find the evidence legally and factually sufficient to support all of the jury's findings, we affirm the trial court's judgment.[2]

## I. Standard of Review

█ In determining legal sufficiency, the appellate court examines "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). In looking at the evidence, we credit favorable evidence if a reasonable jury could and disregard contrary evidence unless a reasonable jury could not. *Id.* The evidence is legally insufficient if

(1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact.

*Chesser v. LifeCare Mgmt. Servs., L.L.C.*, 356 S.W.3d 613, 618–19 (Tex. App.—Fort Worth 2011, pet. denied) (citing *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998)); *see Jelinek v. Casas*, 328 S.W.3d 526, 532 (Tex. 2010).

█ More than a scintilla of evidence exists when the evidence reaches a level enabling reasonable and fair-minded people to differ in their conclusions. *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997). "Less than a scintilla of evidence exists when the evidence is 'so weak as to do no more than create a mere surmise or suspicion' of a fact." *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003) (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)).

█ When reviewing a jury verdict for factual sufficiency of the evidence, we consider and weigh all the evidence and only set aside the verdict if "we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered." *Chesser*, 356 S.W.3d at 619 (citing *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986)); *see Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam).

## II. The Evidence at Trial

### A. Oscar's General Character and Training

Timothy adopted Oscar while he was married to his former wife, Stacey Santibanez. Santibanez testified that Timothy trained Oscar "to bite on command" by using her son, Jason, and his daughter, Elizabeth, as the subjects of the attack. She informed the jury that even though Timothy had attempted to train Oscar to only put his mouth on people on command without actually biting them, Oscar would bite the children "every time" he attempted to train him in that fashion. According to Santibanez, the children believed that

---

**2.** The Turners do not challenge the jury findings that (1) Oscar was a vicious or dangerous dog, (2) the Turners knew or should have known of the dog's vicious or dangerous nature, (3) Duggin's injuries were the result of the dog's vicious or dangerous nature, or (4) the Turners' negligence was a proximate cause of Duggin's injuries. The Turners also do not challenge the jury's award of $50,000.00 for past physical pain and mental anguish, $25,000.00 for past physical impairment, $125,000.00 for future physical impairment, $5,000.00 for past disfigurement, or $15,000.00 for future physical disfigurement.

Oscar was vicious and did not want to participate in training the dog. She testified that Elizabeth still had scars from a puncture wound created by Oscar's bite. Yet, except for the one instance involving Elizabeth, Santibanez denied that Oscar drew blood when he bit the children.

Santibanez described Oscar as a threat to people he did not know. She testified that she was forced to instruct guests to stay away from Oscar because she was concerned for their safety. According to Santibanez, even Paula said Oscar should have been put down a long time ago because of his tendency to bite people.

Cheryl Collins, the sixty-five year-old woman who lived across the street from the Turners, described Oscar as a mean alpha male animal. Collins testified that the Turners regularly allowed Oscar and their other two dogs to roam the neighborhood and that the dogs' demeanor caused her to be afraid for her safety and that of her husband because the dogs had previously acted as if they were going to attack her. Collins and her husband were so afraid of Oscar that they each regularly carried a gun while going to their own mailbox. According to Collins, for several weeks before the incident, Oscar and another dog would come to their yard daily with their heads down and their ears pinned back as they growled, showed their teeth, and dug at her fence in an attempt to attack her four small dogs.

James Kendall Harrison, who also lived next door to the Turners, testified that he was not surprised to hear of Oscar's attack on Duggin. He testified that the Turners' dogs were vicious and that they made him afraid because they seemed as if they wanted to attack. Harrison said that he became nervous when the dogs escaped the Turners' yard, mostly fearing for the safety of his three children, believing that the dogs were a threat to the safety of the entire community.

Harrison's wife, Krystal, also testified that the Turners' dogs would come to her yard three or four times a week. Krystal was afraid for her children's safety because the dogs would bark, growl, and would "have evil in their eyes." Krystal also believed that the dogs stood ready to attack.

Caleb Toles, a friend of Paula's children, Makayela Fuller and Dustin Fuller, testified that Oscar was vicious toward strangers and had bitten his wife, Jenna Toles. Caleb told the jury that he believed that he had also come close to getting bitten by Oscar, but that Oscar obeyed a command from Timothy to not attack. Caleb and Jenna both testified that they heard Timothy bragging about having trained Oscar to assist him in bar fights.

Elizabeth denied that Oscar had been trained to attack, stated that she did not hate Oscar, and claimed that she was only nipped by Oscar twice during horseplay with her brother. Elizabeth clarified that she did not bleed when Oscar nipped her and stated that she had no scars from the incident. Makayela Fuller testified that Oscar caught her pant leg once when she was play-fighting with Dustin. Although she heard that Oscar had bitten others and had attacked a man named Cole Thomason, Makayela testified that Oscar was not dangerous and was a nice dog.

Paula also described the dog as "laid back and easy going" and testified that she had never heard him growl. Timothy denied that he trained the dog to attack to assist him in bar fights. Instead, he explained that he used Oscar to "herd" the children and denied that Oscar had ever bitten Jason. Timothy testified that because he was not concerned about other people's safety around Oscar and (even though he was aware that the dog had

bitten Duggin), he would not mind leaving the gate open for Oscar in the future.

### B. Prior Incidents Involving Oscar

The jury heard that Oscar had bitten several non-family members prior to his attack on Duggin, including Jenna, Thomason, Kelly Wilfong, and Geno Santibanez. Jenna testified that Oscar was aggressive towards strangers. She testified that the first time she was around Oscar, she was reaching for the Turners' door when Oscar lunged towards her and sank his teeth into her skin. Jenna's grandmother, Gaile Comeau, and Caleb both testified that Jenna still had a scar from the deep puncture wound. Comeau testified that Paula was made aware of the wound inflicted by Oscar, being the person who cleaned the wound.

It was also undisputed that Oscar had attacked Thomason. Santibanez described Thomason as an elderly man who was bitten when he was walking on the road of an RV park in New Braunfels. Timothy testified that Oscar bit Thomason because Thomason was walking just outside the front door of an RV owned by Timothy. Oscar was quarantined by Comal County as a result of the attack and was released to Timothy after seven days in quarantine.

Paula and Timothy also admitted that Oscar had likewise bitten Paula's friend, Wilfong, on or about October 29, 2013. Paula testified that Wilfong required medical treatment as a result of the wound created by Oscar and that Oscar was once again quarantined as a result of the attack. According to Paula, Wilfong was returning the Turners' other two dogs to the Turners' backyard (from which they had escaped) when Oscar bit her.

Santibanez testified that Oscar had attacked and bitten her friend's children as they were getting out of a car and that he had twice bitten her husband, Geno Santibanez (who is a longtime friend of Timothy's). On one occasion, Santibanez said that Oscar bit Geno on the leg when he was helping to take out the trash. On the second occasion, Santibanez said that Geno was in the Fast Lane Bar when Oscar was present. Geno reached to pet Oscar and was bitten on his arm even though Timothy had not directed Oscar to attack, this bite being sufficiently serious to cause him to bleed.

Timothy admitted that Oscar bit someone in a bar once. However, when asked about the incident involving Geno, Timothy claimed that Geno had bitten Oscar prior to the attack. According to Santibanez, Geno bit Oscar only after the incident to teach him a lesson. Elizabeth also testified that she heard that Oscar bit Geno first.

There was also testimony that Oscar had bitten family members. According to Caleb, Timothy became intoxicated a few times and would sometimes sic the dog on Dustin. Caleb testified that Oscar ripped through Dustin's jeans on one occasion, drawing blood. According to Jenna, Oscar had also bitten Makayela when she intervened in the dog's attack of her boyfriend. Jenna testified that Oscar could potentially be a threat to a stranger if he was left outside.

### C. The Neighbors Complain About Oscar to the Turners

According to Jenna, both Makayela and Caleb informed Paula that the neighbors were complaining about Oscar. Other evidence at trial demonstrated that the Turners were aware of the neighbors' complaints.

Collins testified that Oscar was in her yard every day for several weeks before Duggin was bitten, regardless of whether the Turners' gate was open or closed. Collins stated that her husband called Paula to inform her of their dogs' behavior and

that Paula's response was simply, "[O]h, the kids probably left the gate open again." According to Collins, when she offered to show Paula the hole in the fence from which the dogs were escaping, Paula declined the offer as if she did not seem to care. Collins testified that she did not stress the issue further because she did not think Paula would act. Collins based this belief on the fact that she had informed Paula about the issue many previous times, but the dogs returned every day. Collins testified that she was so frustrated at the continued presence of the Turners' unfriendly dogs in her yard that she expended $16,000.00 to construct a fence to keep them out.

Harrison testified that he saw the Turners' dogs outside the Turners' yard "at least every other day" for "at least a week or two" prior to the incident involving Duggin. On two separate occasions, the dogs had gotten into Harrison's cow pasture. Harrison testified that he ran the dogs back into the hole in the Turners' fence after the dogs mauled the nose of a sick cow. According to Harrison, his uncle, Ralph Walker, had spoken to Paula about the hole in the fence that allowed the dogs to escape. Nevertheless, Harrison testified that he continued to see the dogs outside of the Turners' property "[p]retty regularly." Krystal also testified that the dogs would escape the fence, which was occasionally left open.

Because Caleb was often at the Turners' home, he testified that he overheard the Turners' expressions of frustration about the dogs escaping the fence. Caleb even assisted Dustin in placing dirt in a hole the dogs had created. He testified that the Turners were certainly aware of their neighbors' complaints. Makayela also testified that she knew of the neighbors' complaints and confirmed that the dogs had

escaped from an open gate "just prior" to the incident involving Duggin.

Paula confirmed that she was aware that the dogs had dug underneath the fence in order to escape the backyard and labeled one of the dogs as the digger. Although she claimed that Collins never called her, she testified that other neighbors (the Coles) complained to her about the dogs running around loose in the neighborhood. Paula testified that she made repairs to the fence because there was a potential for the dogs to escape, but admitted that she did not build an electric fence, use shock collars, chain the dogs, or keep them in an escape-proof enclosure. Timothy denied any knowledge that Oscar was escaping the fence. He said that he did not make any repairs to the fence because he relied on Paula to take care of the situation.

At trial, when asked, "You don't think that [Oscar] had any dangerous propensities to people that it didn't know, do you," Paula responded, "I never said that. He protects us." Although Paula admitted that Oscar had bitten people, she justified the matter by claiming that Oscar had only bitten people on their property. In spite of the incident involving Thomason and Geno, Paula told the jury that she was unaware of anyone accusing Oscar of getting off of the property and biting anyone except for the incident when Duggin had been bitten. Paula denied any claim that the dogs were terrorizing the neighborhood.

### D. Oscar Bites Duggin

On June 3, 2014, the day Oscar bit Duggin, Makayela testified that although she knew Oscar had bitten people before, she left the gate open because she was "frazzled" in her hurry to attend a church function celebrating her upcoming graduation. This oversight provided the opportunity for Oscar to escape the Turners' enclosure and bite Duggin as she was

walking with her friend and neighbor, Roxanne Raymond.

Raymond recalled the incident, stating, "We were talking and just all of a sudden these three dogs come running at us, barking and growling, and literally surrounded us." Raymond testified that although neither she nor Duggin said or did anything to provoke the dogs, Oscar sank his teeth into Duggin's leg and then ran back to the Turners' yard with the other dogs in tow.[3] Duggin testified that Oscar bit into her calf and left a puncture wound so deep that she felt she could stick her thumb through it.

Raymond examined Duggin's bleeding leg and noticed tissue protruding from a very deep wound, one which caused her leg to swell immediately. Raymond, who is a nurse, was concerned about the injury and believed Duggin needed to go to the emergency room for medical treatment. Duggin testified that she could not walk due to the excruciating pain and the amount of blood squirting out from the wound. She took several photographs of her bloody calf, which the jury saw, and went to the emergency room.

Paula testified that Collins called her on the telephone to inform her that Oscar had bitten Duggin. Duggin also spoke to Paula, who was away on vacation at the time, but stated that one of her children must have left the gate open. According to Duggin, the Turners initially agreed to pay her medical bills, but later recanted the offer and hung up on her during a telephone conversation in which Paula clarified they did not have the money to pay Duggin's medical bills. Duggin testified that she continued to see the Turners' dogs roam-

ing outside the Turners' fence even after she had been bitten.

### E. Evidence of Duggin's Injuries

Duggin did not recover as expected after she was released from the emergency room. She testified that the puncture wound was not healing and that the pain and swelling were not alleviated by the medication given to her so she returned to Dr. David L. Reeve several weeks after she had been bitten. After noticing swelling, tenderness, and veins on her calf that were "bulging out," Reeve was concerned that Duggin may have a blood clot and referred her to surgeon Scott Walker.

Walker informed Duggin that she had sustained damage to her veins, which compromised her circulatory system and caused necrosis in the calf. Walker explained that he became alarmed when Duggin was still having difficulty walking three months after Oscar's bite. Duggin testified that she underwent one out-patient procedure and one vascular ablation surgery, during which she was required to remain awake, even though anesthesia was not administered. The surgery remedied the damaged veins, but other blood vessels began to bulge in an effort to re-route blood that was pooling at her foot and was not circulating properly. After visiting five doctors in the span of two years, Duggin was told that there was no more medically viable treatment that could assist her.

At trial, Walker explained to the jury that Duggin (who was forty-two years old when Oscar bit her) suffered what proved to be a persistent life-long problem as a result of Oscar's bite. He informed the jury that the pain and swelling of her leg as a result of walking or standing would remain constantly, would not likely im-

---

**3.** Raymond testified that she also saw the dogs outside of the Turners' yard on several occasions prior to Oscar's attack on Duggin. In describing the demeanor of the Turners' dogs, Raymond said that they snarled and acted like they would attack even when they were enclosed by the Turners' fence.

prove, but could possibly get worse as Duggin aged. Walker testified that there was no cure for Duggin and that her condition could also lead to future infection and ulceration of the skin. Walker explained that someone with Duggin's medical condition could reasonably experience emotional distress as a result of the life-long injury.

### F. The Effect of Duggin's Injuries on Her Life

Duggin testified that she deals with pain every day and that her entire family has experienced strain as a result of her injuries. She described the means by which the injuries she sustained in Oscar's attack had impacted her in her roles as a special education teacher, a serious competitive equestrian, and a mother to her children, Tye (a fourteen-year-old boy) and Kensie (a nine-year-old girl).

Duggin testified that her job as a special education teacher is emotionally and physically strenuous. In order to effectively perform her job, she is required to sit on the floor with the children and to walk with them if they have a breakdown. Duggin testified that she goes up and down stairs with the class, stands and walks while teaching, and described herself as always on the move while at work. Duggin's mother, Jane Trierweiler, who is also a teacher at Duggin's school, testified that she regularly sees her daughter elevate and massage her leg during the lunch hour as a result of swelling.

Justin Brown, who has trained and shown horses for twenty-one years, testified that Duggin grew up in the horse industry and has won many competitive awards. The jury viewed photographs of Duggin demonstrating that she had loved horses since she was a child, had shown horses at competitions, and had been a competing equestrian for her entire life. Duggin testified that she had won a number of national and world titles in equestri-an competition. She had been offered a full scholarship to the University of Florida due to her equestrian skills and hoped to pass on her success to her children.

Duggin testified that before the incident, she rode horses with her children three to five times per week and that her children had carried on her love of and success in equestrian competitions. Duggin testified that not only did her leg injury prevent her from riding or showing horses, it also barred her from the endeavors of the family in the raising and showing of swine and sheep. Duggin displayed awards she had won at prior livestock shows, but testified that as a result of injuries sustained in the dog's attack, she was unable to shear sheep and exercise or clip pigs in preparation for the most recent livestock show. Walker confirmed that it would be painful for Duggin to ride horses and Brown, Trierweiler, and Raymond all confirmed that Duggin was unable to do so. Brown, who was still training Kensie, testified that he personally witnessed how deeply the injury had emotionally affected Duggin, bringing her to tears.

Duggin testified that before she was bitten by the dog, she (in addition to riding horses) was on a swimming and diving team and regularly used her treadmill at home. She also practiced sports with Tye and Kensie, who both played basketball and softball. Raymond testified that before the dog bite, Duggin and her husband often walked around the neighborhood together but that Duggin's pain from the injury now prohibited her from doing so. Duggin and Trierweiler both testified that Duggin could no longer play with her children.

Duggin explained that the pain of her leg was so severe that she was now forced to become sedentary, that she had no option but to elevate her leg when she got

home, and that she had gained weight as a result of her forced inactivity. Duggin indicated that she experienced no relief from the throbbing pain in her leg and that the disfigurement to her leg occasioned by the dog bite (including bulging veins) distressed her. Duggin lifted her pant leg for the jury to see the veins and scars, which she described as ugly, and she revealed it had caused her to refrain from wearing shorts. Because she was concerned about her leg's physical appearance, Duggin visited a plastic surgeon, who told her that plastic surgery would not alleviate the situation.

Duggin's husband, Tim Duggin, testified that the whole family had been affected by Duggin's injuries and that he had heard his wife crying in the shower at times. He said that Duggin took more breaks at school due to leg pain and that she could no longer use the treadmill or be with their animals because she had to rest and ice her leg every day. Duggin testified that if Tim accidentally bumped her leg at night while they were in bed, the resulting pain caused her to lose sleep. Tim and Duggin both testified that they were concerned about future health problems which could be caused as a result of the injury.

### III. Award for Future Physical Pain and Mental Anguish Is Supported by the Evidence

The jury was given a single blank to determine what amount, if any, would fairly and reasonably compensate Duggin for future physical pain and mental anguish. The jury answered with a figure of $350,000.00. The Turners argue that this award must be overturned because there was no evidence that Duggin would suffer mental anguish in the future. We apply the same standards of review to legal and factual sufficiency challenges to the evidence supporting a jury's damage award

as we do to legal and factual sufficiency challenges on a jury's liability findings. *See Gen. Motors Corp. v. Burry*, 203 S.W.3d 514, 549 (Tex. App.—Fort Worth 2006, pet. denied). Since the Turners lodged no objection to the lack of segregation in the jury charge of the mental anguish damages from the question pertaining to physical pain damages, we cannot now differentiate between the award of one kind of damage from the other. *Cowboys Concert Hall–Arlington, Inc. v. Jones*, No. 02-12-00518-CV, 2014 WL 1713472, at *19 (Tex. App.—Fort Worth May 1, 2014, pets. denied) (per curiam) (mem. op.).

"The presence or absence of pain, either physical or mental, is an inherently subjective question." *Gen. Motors Corp. v. Burry*, 203 S.W.3d 514, 551 (Tex. App.—Fort Worth 2006, pet. denied). Here, there is no real dispute that Duggin established the existence of physical pain. The question is whether the jury awarded too much for the combined line item of future physical pain and mental anguish.

Although the "duration of the pain and mental anguish is an important consideration," "[n]o objective measures exist for analyzing pain and suffering damages." *Id.* at 551–52. Accordingly, "[t]he process of awarding damages for amorphous, discretionary injuries such as mental anguish or pain and suffering is inherently difficult because the alleged injury is a subjective, unliquidated, nonpecuniary loss." *Id.* at 551. "Thus, once the existence of some pain and suffering has been established, there is no objective way to measure the adequacy of the amount awarded as compensation." *Id.* at 522.

Consequently, "[t]he jury is given a great deal of discretion in awarding an amount of damages it deems appropriate for pain and suffering." *Id.* "Despite this broad discretion, there must 'be some evidence to justify the amount awarded,'

as a jury 'cannot simply pick a number and put it in the blank.'" *Id.* (quoting *Saenz v. Fid. & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex. 1996)).

▮▮▮▮▮▮ There "must also be evidence that the amount of mental anguish damages awarded is fair and reasonable, and the appellate court must perform a 'meaningful evidentiary review' of the amount found." *Id.* (quoting *Saenz*, 925 S.W.2d at 614). This is because

> mental anguish damages [can]not be awarded without either "direct evidence of the nature, duration, or severity of [plaintiffs'] anguish, thus establishing a substantial disruption in the plaintiffs' daily routine[,"] or other evidence of "a high degree of mental pain and distress" that is "more than mere worry, anxiety, vexation, embarrassment, or anger."

*Saenz v. Fid. & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex. 1996) (quoting *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995)). "Furthermore, 'some types of disturbing or shocking injuries have been found sufficient to support an inference that the injury was accompanied by mental anguish.'" *Fifth Club, Inc. v. Ramirez*, 196 S.W.3d 788, 797 (Tex. 2006) (quoting *Parkway Co.*, 901 S.W.2d at 445) (citing *Brown v. Sullivan*, 71 Tex. 470, 10 S.W. 288, 290 (1888) ("Where serious bodily injury is inflicted involving fractures, dislocations, etc., and results in protracted disability and confinement to bed, we know that some degree of physical and mental suffering is the necessary result.")).

The nature, duration, and severity of Duggin's injuries and their impact on her life were well established by the record and a reiteration of those things already described would be redundant.

"Texas has authorized recovery of mental anguish damages in virtually all personal injury actions." *City of Tyler v. Likes*, 962 S.W.2d 489, 495 (Tex. 1997) (quoting *Krishnan v. Sepulveda*, 916 S.W.2d 478, 481 (Tex. 1995)). Based on the nature, severity, and duration of Duggin's injuries and due to the testimony of the medical personnel, the jury was free to determine that the mental anguish suffered by Duggin in the past would not subside in the future. Thus, on the record presented here, we find that the evidence was both legally and factually sufficient to establish that Duggin would suffer mental anguish in the future. We now turn to arguments related to the amount of damages awarded.

▮▮▮▮ At trial, Duggin asked the jury to award her $25,000.00 for her past physical pain and suffering that she claimed she experienced during the 648 days between the time of the dog bite and her trial. The jury returned with a verdict of $50,000.00 for both past physical pain and mental anguish. Assuming that the jury awarded the requested $25,000.00 for Duggin's past physical pain—with the other $25,000.00 for mental anguish—that award is the equivalent of $38.58 per day. Stated differently, the jury's award is the equivalent of an award of $38.58 for past physical pain and $38.58 for past mental anguish per diem for the 648 days Duggin experienced those types of pain before trial. The Turners do not argue on appeal that this $50,000.00 award for past physical pain and mental anguish is unreasonable. With this backdrop in place, we now turn to Duggin's argument concerning her damages for future physical pain and mental anguish.

Duggin asked the jury to consider future mental anguish without asking for a specific amount, but she argued that the damages for her future pain should be calculated at a rate of $30.00 per hour for the rest of her life. Duggin stated that at a minimum, the jury should consider her life

expectancy to be thirty years, and she clarified that she sought a minimum of $300,000.00 for future physical pain alone, in addition to future mental anguish.

If one assumes a life expectancy of an additional thirty years for Duggin, the jury awarded less per day for future pain and suffering than they did for the pain and suffering experienced in the past.

Based on the evidence adduced at trial that Duggin would continue to suffer the same injuries throughout her life and that her life expectancy was thirty years, we cannot say that the jury's award of $350,000.00 for future physical pain and mental anguish was unreasonable. The jury's award is seven times the $50,000.00 awarded for past physical pain and mental anguish. Since the testimony establishes that Duggin is likely to experience much the same life in the future as she has experienced since the dog bite, it would not be unreasonable to apply the same measure of damages for future pain as was applied for past pain. Had that been done, the jury would have awarded Duggin $422,451.00 for future physical pain alone (365 days x 30 years = 10,950 days; 10,950 days x $38.58 = $422,451.00). Thus, the lesser award of $350,000.00 by the jury for combined future physical pain and mental anguish does not appear unreasonable.[4]

In other words, the use of two different methodologies leads to the conclusion that the jury's award was supported by the evidence. First, the evidence was legally and factually sufficient to support a $350,000.00 joint award for future physical pain and mental anguish. Alternatively, because we cannot segregate the award (even if one assumes that the jury awarded nothing for future mental anguish damages), the evidence was also legally and

factually sufficient to support an award for $350,000.00 for future physical pain alone. Consequently, we find that the jury's award of $350,000.00 was supported by the evidence and overrule the Turner's first point of error.

## IV. Sufficient Evidence Supports the Jury's Gross Negligence Finding

In their pleadings, Duggin alleged that the Turners' were grossly negligent in, among other things, failing to adequately supervise the vicious dog, entrusting the responsibility to a child of supervising and containing the vicious dog, allowing their vicious dog to escape the yard, and training the dog to be vicious and attack strangers. The Turners contend that the jury's finding of gross negligence is not supported by the evidence.

Gross negligence is "more than momentary thoughtlessness, inadvertence or error of judgment." *I-Gotcha, Inc. v. McInnis*, 903 S.W.2d 829, 841–42 (Tex. App.—Fort Worth 1995, writ denied). Specifically, gross negligence is an act or omission

(A) which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

(B) of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

Tex. Civ. Prac. & Rem. Code Ann. § 41.001(11) (West Supp. 2016).

---

4. The Turners also argued that the "$350,000 lump sum awarded by the jury for future pain and suffering and mental anguish may only be upheld if the pain and suffering element can support the entire $350,000 award."

The definition of gross negligence makes clear that it "has both an objective and a subjective component." *Reeder v. Wood Cty. Energy, LLC*, 395 S.W.3d 789, 796 (Tex. 2012), *opinion supplemented on reh'g* (Mar. 29, 2013). "Circumstantial evidence may be sufficient to prove both elements, and some evidence of care by movants does not necessarily defeat a showing of gross negligence." *LaRue v. Chief Oil & Gas, L.L.C.*, 167 S.W.3d 866, 879 (Tex. App.—Fort Worth 2005, no pet.).

The Turners argue that the evidence was legally and factually insufficient to support the jury's finding of gross negligence because it did not show (1) that Oscar presented an extreme risk or (2) that they had knowledge that Oscar would attack someone off of their property.[5] They further argue that the elements of gross negligence cannot be met because there were no prior instances of Oscar escaping the yard and biting a stranger.

Before we delve into the examination of gross negligence, we note that the Turners do not challenge the finding that Oscar was a vicious dog or that they knew of Oscar's vicious nature.[6] The evidence recited above, demonstrating Oscar's attacks on others and Paula's and Timothy's knowledge of these attacks supported these unchallenged findings. Because (1) Oscar was a vicious dog and (2) the Turners failed to contain him, (3) even though they knew he had bitten others, and (4) was escaping from their yard, we conclude that the jury's finding of gross negligence was supported by clear and convincing evidence and was not contrary to the great weight and preponderance of the evidence. Timothy has additional culpability because the evidence shows that he encouraged the viciousness of the dog by training him or encouraging him to bite humans.

With respect to the objective component of gross negligence, "[e]xtreme risk means the likelihood of serious injury to the complaining party." *Id.* The evidence showed that Timothy trained Oscar to bite people and that Oscar had a history of biting others. Oscar had previously caused seri-

---

5. In making this argument, the Turners' brief contains the following statement: "While there is evidence pointing to the dog snapping and nipping at people on multiple occasions, there is no evidence that any of these people, other than Duggin, required medical treatment or experienced any kind of serious injury." Paula testified that she knew Wilfong underwent medical treatment for her wounds from Oscar. There was also evidence that Jenna sustained a deep puncture wound which left a scar. Additionally, the Turners argue that they did not know Oscar would bite someone if he escaped since he had never done that before. In support, they cite to *Trujillo v. Carrasco*, 318 S.W.3d 455, 460 (Tex. App.—El Paso 2010, no pet.), which held that the mere fact that "a dog had previously escaped its pen was insufficient to establish foreseeability" that the dog would kill another person's hens and chickens. *Trujillo* is easily distinguishable since there was no evidence in that case that the defendant's dog was vicious.

6. "An owner of a vicious animal can be strictly liable for harm, while an owner of a non-vicious animal can be 'subject to liability for his negligent handling of such an animal.'" *Bushnell v. Mott*, 254 S.W.3d 451, 452 (Tex. 2008) (per curiam) (quoting *Marshall v. Ranne*, 511 S.W.2d 255, 259 (Tex. 1974)). The reason for the imposition of strict liability is explained in the Third Restatement of Torts, which states:

> Given the defendant's knowledge, the reasonableness of the defendant's conduct in retaining the animal is at least questionable, and strict liability gives the owner an incentive to consider whether the animal should be retained. Even if that retention is itself proper, an abnormally dangerous animal is by definition unusual; owning such an animal is an activity engaged in by a few that imposes significant risks on others within the community. In these circumstances, strict liability is fairly imposed.

RESTATEMENT (THIRD) OF TORTS, § 23 cmt. b (2010).

ous injury to Wilfong and Jenna, attacks of which Paula was fully aware. Several of the Turners' neighbors testified that the dogs regularly escaped the yard through holes they created in the fence. Given the jury's finding that the Turners knew of Oscar's vicious propensities, a reasonable jury could determine, by clear and convincing evidence, that failing to ensure that the dog was secured in the yard by chaining or enclosing him (especially when the Turners were out of town [7]) posed a likelihood of serious injury to others, even when viewed objectively from Turners' standpoint. A jury could certainly reasonably conclude that Paula and Timothy were both negligent in entrusting the monitoring of the vicious animal to a mere child—who eventually left open the gate, allowing the animal to roam free in the neighborhood. Thus, the evidence supports the objective component of gross negligence.

 "In examining proof of the subjective component, courts focus on the defendant's state of mind, examining whether the defendant knew about the peril caused by his conduct but acted in a way that demonstrates he did not care about the consequences to others." *Reeder*, 395 S.W.3d at 796 (citing *Diamond Shamrock Ref. Co., L.P. v. Hall*, 168 S.W.3d 164, 173 (Tex. 2005) ("[T]he plaintiff must show that the defendant knew about the peril, but his acts or omissions demonstrate that he did not care.")). In making a determination of "whether an act or omission involves peril," we must be careful to view the record from the defendant's perspec-

tive instead of reviewing the matter in hindsight. *Id.*

 The Turners argue that they were unaware that Oscar would escape the yard and attack someone because he had previously only attacked people on their property and in their presence for the purposes of protecting them and their property. Yet, the jury heard (1) that Timothy knew that Oscar had attacked Thomason, who was simply walking by the Turners' property [8] and (2) that Paula knew that Oscar attacked Jenna Toles (a friend of Makayela) as she was opening a door when she first met Oscar. Neither Thomason nor Jenna were threatening the Turners or their property. Thus, the jury could determine that Timothy and Paula were actually aware that the dog, who would bite without provocation, was a risk to the safety of strangers. In fact, the jury heard that the Turners kept the dog in an enclosure in the backyard during parties, certainly an indication that they suspected that the dog would bite people. Based on Oscar's history of biting people, the jury, as fact-finder, could determine that Oscar was isolated from people during gatherings because he posed a threat to the welfare and safety of others.

 Santibanez testified that Paula said she believed that Oscar should have been put down because of his tendency to bite people. Paula, Caleb, Makayela, and others testified that the Turners were put on notice that the dogs were escaping their yard. [9] Krystal testified that the dogs es-

7. Caleb testified that Oscar almost attacked him, but obeyed Timothy's command to stop the attack. This evidence indicated that the dog was even more dangerous when the Turners were not present to calm him than he was when unaccompanied by Timothy.

8. Since this attack occurred in another county, it presumes that the dog was able to differentiate between real property owned by his

master and property that was not. One would suspect that the dog was unaware whether Thomason was near property under the control of the Turners.

9. While the Turners are correct that "a party cannot be liable for gross negligence when it actually and subjectively believes that circumstances pose no risk to the injured party, even if they are wrong," evidence of the Turners'

caped through gates that were left open by the Turners, and the jury heard from Makayela that Oscar and the other dogs had escaped through an open gate just prior to the incident involving Duggin. Because the evidence also showed that the Turners knew Oscar was escaping the yard, the jury could also determine that the Turners knew Oscar would be a threat to strangers if he escaped the yard, whether through a gate opened by someone or a hole in the fence. Even so, they entrusted Makayela, a child, with the responsibility of corralling the vicious dog as they went out of town.

Given the fact that the Turners had an enclosure in the backyard and had received several complaints about the dogs escaping and threatening the neighborhood, a reasonable jury could have determined that the Turners were subjectively aware of the risk to others should Oscar escape. Even aware of the risk, the Turners' failure to ensure that Oscar would not escape (by either chaining him or keeping him in an escape-proof enclosure) demonstrated that they proceeded with conscious indifference to the safety and welfare of others. Further, the jury could have well determined the culpability of Timothy in encouraging Oscar in his viciousness and the irresponsible behavior of both Timothy and Paula in entrusting the confinement of a vicious animal to a child. In other words, the evidence shows (1) that Timothy encouraged the vicious propensity of the dog for his own benefit and (2) that the Turners knew about the peril of their vicious dog escaping and biting others, but did not care. Collins' testimony regarding Paula's response to her complaints, Paula's demeanor when she declined Collins' invitation to point to the hole in the fence, testimony that the dogs

continued to roam the neighborhood after Duggin's attack, and Timothy's testimony that he had no problems with leaving the gate open for Oscar in the future all supported the jury's finding on the subjective component of the gross negligence finding.

Even when the evidence is viewed from the Turners' standpoint, we conclude that it enabled a reasonable and fair-minded jury to find, by clear and convincing evidence, that the Turners were grossly negligent. Likewise, we also find that the credible evidence supporting the gross negligence finding was not so weak, or so contrary to the overwhelming weight of all the evidence, that it should be set aside. Therefore, we conclude that the evidence was legally and factually sufficient to support the gross negligence finding and overrule the Turners' second point of error.

## V. The Exemplary Damage Award is Supported by the Evidence

In their last point of error, the Turners argue that the jury's awards of exemplary damages of $75,000.00 against Timothy and $50,000.00 against Paula were excessive. "We review the alleged excessiveness of an exemplary damages award under state law as a factual sufficiency challenge." *Wilen v. Falkenstein*, 191. S.W.3d 791, 802 (Tex. App.—Fort Worth 2006, pet. denied) (citing *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406 (Tex. 1998)). "We may only reverse if the exemplary damages award is so against the great weight and preponderance of the evidence as to be manifestly unjust." *Id.*

We begin by noting that the jury's award of exemplary damages is approximately eighteen percent of the compensatory damage award and less than

actual knowledge and belief, which also came from the testimony of other parties, supported the gross negligence finding. *U-Haul Int'l,*

*Inc. v. Waldrip,* 380 S.W.3d 118, 141 (Tex. 2012).

$200,000.00, and is therefore within the statutory exemplary damages limitation. TEX. CIV. PRAC. & REM. CODE ANN. § 41.008(b) (West 2015). In determining the amount of exemplary damages, a jury shall consider evidence relating to the following factors, if any:

(1) the nature of the wrong;

(2) the character of the conduct involved;

(3) the degree of culpability of the wrongdoer;

(4) the situation and sensibilities of the parties concerned;

(5) the extent to which such conduct offends a public sense of justice and propriety; and

(6) the net worth of the defendant.

TEX. CIV. PRAC. & REM. CODE ANN. § 41.011(a) (West 2015). "The amount of exemplary damages rests largely in the discretion of the jury and should not be disturbed unless the damages are so large as to indicate that they are the result of passion, prejudice, or corruption." *Wilen*, 191 S.W.3d at 802.

There was no evidence of the Turners' net worth. As for the remaining factors, the jury heard evidence that Timothy had trained Oscar to attack people and that Oscar was a vicious dog who had previously seriously attacked strangers. In spite of numerous complaints made by neighbors, the Turners' solution to repair holes in their fence dug by their dogs was simply to place more dirt in the holes for the dogs to dig. When they left town, they negligently entrusted the dog's confinement to a child. Evidence at trial showed that the dogs had escaped from an open gate "just prior" to when Duggin was bitten by Oscar and continued to roam the neighborhood after the incident. Thus, the jury properly concluded that the Turners allowed Oscar to roam the neighborhood almost every day by failing to properly secure him in their yard, even when they were out of town.[10] Collins testified that Paula did not seem to care when Oscar escaped, and the Turners justified Oscar's unprovoked attacks on others by claiming that they only happened on their property, were not serious attacks, or only occurred when Oscar was trying to protect the Turners or their property. In spite of all of the evidence, Timothy and Paula both testified that Oscar was a nice dog, and Timothy told the jury he had no problem leaving his gate open for Oscar in the future. In other words, the jury heard from Timothy that he would continue to allow his vicious dog to roam a neighborhood housing children and the elderly—a notion which the jury could determine offended a public sense of justice and propriety.

In light of the evidence presented, we cannot conclude that the jury's award of exemplary damages was so against the great weight and preponderance of the evidence as to be manifestly unjust. Accordingly, we overrule the Turners' last point of error.

## VI. Conclusion

We affirm the trial court's judgment.

---

10. The Turners argue that exemplary damages were not warranted because their daughter left the gate open while they were out of town. While it is true that "[p]unitive damages are not a weapon to punish parents for the inadvertent acts of their children," Duggin argues that the jury's findings were not based on Makayela's actions, "but rather on a long history of mishandling the dog at issue, beginning with its training to attack, and continuing with the Turners' flagrant disregard to the safety of their community by allowing a dog they knew was aggressive toward strangers to leave their yard on a regular basis prior to the Duggin attack." We agree.