COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | | |
|---|---|---|
| C&C ROAD CONSTRUCTION, INC., | § | |
| Appellant/Cross-Appellee, | § | No. 08-17-00056-CV |
| v. | § | Appeal from the |
| | § | County Court at Law Number Six |
| SAAB SITE CONTRACTORS, L.P., | § | of El Paso County, Texas |
| Appellee/Cross-Appellant. | § | (TC# 2014DCV2960) |
| | § | |

## **O P I N I O N**

Road construction is ubiquitous in our society; and, here we deal with a dispute between two road construction contractors. A jury found that a general contractor failed to pay its subcontractor the full amount due under two contracts for road work on two rural highways. The jury determined that the general contractor breached both contracts but awarded only half of the amount it claimed had been due, only a portion of its attorney's fees for trial, and nothing for attorney's fees on appeal. The general contractor challenges the charge submitted to the jury. In turn, the subcontractor cross-appeals, complaining of the jury's reduction of its damage claim and the zero-dollar answer for attorney's fees for appeals. We conclude (1) that the general contractor's requested issues were properly refused; (2) that the subcontractor did not prove the amount of its claimed damages as a matter of law, and thus the jury's finding on damages should

stand; and (3) that the jury's zero finding of appellate attorney's fees cannot stand. We affirm in part and reverse and remand in part.

## BACKGROUND

In 2009 the Texas Department of Transportation (TXDOT) hired C&C Road Construction, Inc. (C&C) to add passing lanes to a four-mile stretch of U.S. 67 and to resurface a seventeen-mile portion of U.S. 385, both roads in rural Pecos County. In turn, C&C hired SAAB Site Contractors, L.P. (Saab). In general, Saab prepared the roadbed and C&C constructed the road surface.

The road construction contracts are based for the most part on unit pricing. TXDOT estimated a quantity for each of the distinct tasks needed to complete the project. In its subcontracts, Saab agreed to perform several of those distinct tasks, also based on a unit price. For example, on one of the jobs Saab undertook to prepare 187 units of right-of-way (which equates to a known distance in the industry) at $80.22 per unit, for a total price of $15,001.14. As the work progressed, Saab submitted payment applications to C&C that would request payment on the portion of each task actually completed. If TXDOT's estimates agreed that the work was completed, it would release funds to C&C, who in turn would pay Saab for its work. When the job was finally completed, the total units estimated by TXDOT were adjusted to reflect what actually was done to complete the project. But when TXDOT closed out the project with a final accounting on these jobs, C&C refused to pay Saab the balance left due under both contracts.

We provide a few more details about both projects and the nature of the parties' dispute.

### U.S. 67

Saab contracted with C&C to provide the labor and material to accomplish ten unit-based tasks needed to add passing lanes along a four-mile portion of U.S. 67. Most of that work related to widening the roadway, building shoulders, and providing traffic control. Saab's contract price

totaled $203,183.14. When it finished its work, however, Saab adjusted its claim downward based on the quantity of units completed, and inclusion of a $2,137.23 change order that TXDOT had approved, to seek a total amount owed of $187,707.37. Given that C&C had already made interim payments totaling $151,993.50, the balance remaining owed to Saab amounted to $35,713.87.

Under the contract, Saab's payment was contingent on TXDOT's acceptance of work performed and its payment to C&C. When TXDOT finally reconciled with C&C, it accepted all the units that Saab had completed, and in fact allowed $685,993 just for the work that Saab had performed. Saab thus claimed it was entitled to full payment of the remaining $35,713.87 due under its contract and the change order.

TXDOT had also, however, assessed liquidated damages against C&C for $57,500 due to 92 days of delay in completing the project. And in September 2010, TXDOT had also adjusted down C&C's total contract from $1,998,738.80 to $1,768,460.20 before assessing the liquidated damage penalties.

Nonetheless, Edward Saab testified that Saab commenced its work on time. It never received any written notice of any deficiency on the job. He agreed the job got complicated when TXDOT required that an extra 1.5 inches of base material be added to remove a drop off on the edge of the roadway. The additional material and labor were not within the original scope of the contract. Saab in fact requested $114,951.42 for the extra work. Despite C&C's efforts to obtain a change order from TXDOT covering that amount, TXDOT eventually only approved an additional $2,137.23. Saab's damage claim at trial accepted this reduction by TXDOT.

Alfredo Corral, the principal for C&C, testified that in adding the 1.5 margin to the roadbed, Saab had overordered base material, and used the wrong equipment or misused the equipment to accomplish the task. C&C's office manager testified that in November 2009, C&C

3

deducted $14,670 and $6,440 from Saab's pay application because C&C had actually performed the work being claimed.[1]  In total, the office manager estimated that C&C deducted $26,000 or $27,000 from Saab's contract because C&C had actually done that work.

## U.S. 385

The U.S. 385 project re-worked some seventeen-miles of roadway.  In this project, Saab used a large piece of equipment referred to as a "reclaimer" to pulverize and grind up the existing roadway.  They would then add cement to the mixture and regrade the material into a new stabilized base.  C&C would follow behind, apply an emulsion, and would finish the road with a "chip seal" on top of the cement-stabilized base.

Saab claims that performance of its portion of the project, under the unit pricing formula, totaled $256,546.56.  C&C had made interim payments to Saab of $176,954.98, leaving a balance due of $79,591.58.  As with the other project, Saab evidenced TXDOT's final acceptance of the project that showed C&C was paid $639,151.07 for the specific units of work that Saab performed. Part of Saab's damage claim of $79,591.58 also included several change orders that TXDOT approved, but which C&C never credited to, nor informed Saab of.  In its damage claim at trial, Saab claimed 95 percent of the value of those change orders, noting that under TXDOT rules, a general contractor can only mark-up a subcontractor's charge by no more than 5 percent.

Both parties agreed the U.S. 385 project ran into several problems.  TXDOT required that the road be kept open at night.  Saab claimed that because C&C did not put down the emulsion immediately following Saab's work, the night traffic would damage the base course of the roadbed. Saab acknowledged that TXDOT required that the road base "cure" for three days before putting

---

[1] The trial court excluded an exhibit that contained these numbers after the witness could not identify any source documents supporting them.  The deductions are in the testimonial record, however, as Saab did not move to strike this portion of the office manager's testimony.

down the emulsion. Nonetheless, Saab simply disagreed with how TXDOT read the applicable specifications and claimed it was not responsible for maintenance of the base course.

Saab also claimed that the reclaiming machine, which C&C provided, applied water unevenly which then made blading the base course more difficult. Saab contended that other C&C equipment was often broken down and C&C experienced a constant turnover of manpower and supervisors. Saab further claimed that the project was delayed by C&C's faulty application of the chip seal, which required that entire sections of roadway be scrapped off and reworked.

C&C acknowledges several of the problems on this job. It in fact received a ten-day default letter from TXDOT that necessitated a meeting with TXDOT officials in Odessa (which Saab attended). At trial, C&C contended that Saab's improper compaction of the base course was the most pressing problem. Following the meeting with TXDOT, C&C claimed it was required to double its crews and equipment to do the work assigned to Saab. It claims to have brought in at least two more motor graders, another reclaimer, and pneumatic rollers to complete the project. C&C raised another specific issue. TXDOT noticed that Saab discarded excess base material alongside of the road. TXDOT required that the excess material be disposed off-site. Nonetheless, workers put it back into roadway, creating a ridge in the base course that needed to be graded off before it hardened. On one occasion, TXDOT had threatened to shut down the project over this issue, yet Saab workers left for the day and returned to El Paso.

TXDOT imposed $28,125 in liquidated delay damages against C&C for the U.S. 385 project. C&C also claimed that it incurred (1) $23,473 in costs for Saab's work that it actually performed, (2) $9,109 in equipment rental costs to do Saab's work, and (3) $26,620 for an incorrect

5

unit cost that Saab used.  In all, C&C had to pay back $60,539 after TXDOT's final reconciliation in September 2010.  C&C claimed to have lost some $800,000 on the project.[2]

## The Litigation

Saab filed its breach of contract suit against C&C on September 17, 2014.[3]  C&C filed a counterclaim almost a year later on August 21, 2015.  The counterclaim alleged that Saab breached its contracts with C&C by failing to perform its work in a timely manner, failing to provide sufficient manpower and equipment, and performing its work in a deficient manner.  C&C sought in excess of $1,000,000 in damages.

Saab moved for summary judgment on the counterclaim, claiming that it was barred by the four-year statute of limitations for contract claims.  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 16.004.  Saab established that all the work on both contracts was completed by no later than July 2010 and TXDOT had issued it final payment packages on both projects by November 2010.  The counterclaim was thus untimely under the four-year statute of limitations, and the thirty-day saving provision of TEX. CIV. PRAC. & REM. CODE ANN. § 16.069 (extending the period for filing a counterclaim or cross-claim for 30 days beyond the defendant's answer date though it would otherwise be barred, provided that the claim arose out of the same transaction).  The trial court agreed and rendered summary judgment barring the counterclaim.  The court expressly stated in its ruling that "nothing in this Order shall prevent [C&C] from asserting [Saab's] alleged breach of contract as a defense to any cause of action asserted by [Saab]."

---

[2] Lest we leave the wrong impression, Saab contested each of these claims.  It denied that C&C ever did any of Saab's work, nor used any leased equipment to accomplish Saab's assigned tasks.  Saab pointed out the lack of any written documentation of C&C's offsets and emphasized that C&C never served any written notice of deficiencies on the jobsite.  Moreover, Saab and C&C had participated in seven projects together, and C&C actually hired Saab for one of those jobs after these projects.

[3] Saab's owner explained that the company waited almost four years to file suit because of the financial stress it experienced following the 2008 recession.

6

## The Jury Charge and Verdict

Following two- and one-half days of testimony in a hotly contested jury trial, the trial court submitted two liability questions, asking *inter alia* if C&C failed to comply with the U.S. 67 and U.S. 385 contracts with Saab. The jury answered yes to each question. Damage questions asked the jury to find the difference between the amount C&C agreed to pay, and what it actually paid under each contract.

The jury found Saab incurred $17,856.94 in damages on the U.S. 67 contract. That amount is half of what Saab had sought. The jury awarded $37,003.62 in damages for the U.S. 385 contract. Saab reasons this amount was also effectively half of the damages proven at trial. Saab had sought $79,591.58 but acknowledged during trial that it had failed to account for a check it received and cashed in the amount of $17,666.33. Also during trial, Saab discovered that C&C was paid an additional $12,082 for a change order applicable to Saab's work. Adding the change order and deducting the miscounted check from Saab's initial claim for damages, and then dividing that sum by two yields exactly what the jury awarded: $37,003.62.

The jury also made findings on attorney's fees that Saab incurred to prosecute the claim. Saab's attorney had testified about those amounts, and submitted invoices substantiating the claim. The jury awarded $85,000 for the work done through trial (an amount less than the $145,064.79 that Saab requested). The jury also answered "zero" for representation in an appeal to this Court, and at each stage of any petition for review to the Texas Supreme Court.

The trial court refused to submit four liability questions requested by C&C. For each of the two contracts, C&C's requested two questions that asked (1) if Saab had failed to comply with the respective contract, and (2) as between C&C and Saab who had failed to comply first.

## DISCUSSION

7

C&C appealed and in two issues complains of the failure to submit its requested jury questions inquiring of Saab's breach of the U.S. 67 contract. Saab cross-appeals and complains of the trial court's denial of its motion for judgment notwithstanding the verdict. Relevant here, that motion sought (1) the full measure of damages that Saab sought at trial under the U.S. 67 and U.S. 385 contracts, and (2) the amount of appellate attorney's fees that Saab testified to at trial. We take each issue in turn.

## The Trial Court did not err in refusing C&C's requested charge

On appeal, C&C complains in two issues presented that the trial court erred in not submitting its requested questions two and three with accompanying instructions. Those questions would have asked whether Saab "fail[ed] to comply with its contract with [C&C] for construction work on U.S. 67" and if so, who between Saab and C&C "failed to comply first?"[4]

### Standard of Review

We review charge error for an abuse of discretion. *Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex. 2006); *Salas v. Total Air Services, LLC*, 550 S.W.3d 683, 689 (Tex.App.--El Paso 2018, no pet.). "A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles." *Walker v. Gutierrez*, 111 S.W.3d 56, 62 (Tex. 2003), *citing Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). One guiding rule or principle holds that a trial court must submit in the charge all questions, instructions, and definitions raised by the pleadings and the evidence. *See* TEX.R.CIV.P. 278; *Hyundai Motor Co. v. Rodriguez*, 995 S.W.2d 661, 663 (Tex. 1999).

---

[4] C&C's requested questions eight and nine asked identically worded questions about the U.S. 385 contract, but its issue on appeal expressly references only the requested issues for the U.S. 67 contract. Just prior to oral argument, C&C sought leave to amend its brief to add issues addressing the U.S. 385 contract. Saab opposed the motion, noting that the case had already been fully briefed. We deny the motion to amend the brief but note that had C&C complained of the omission of the U.S. 385 requested questions, our analysis and conclusion would have been identical to how we view the U.S. 67 questions.

8

In reviewing the charge, we consider the pleadings, the evidence presented at trial, and the charge in its entirety. *De Leon v. Furr's Supermarkets, Inc.*, 31 S.W.3d 297, 300 (Tex.App.--El Paso 2000, no pet.). Even if the trial court has abused its discretion, we reverse only when the error is shown to be harmful. *Boatland of Houston, Inc. v. Bailey*, 609 S.W.2d 743, 749-50 (Tex. 1980). "We may not reverse unless the error, when viewed in light of the totality of the circumstances, amounted to such a denial of the rights of the complaining party as was reasonably calculated and probably did cause rendition of an improper judgment." *Braudrick v. Wal–Mart Stores, Inc.*, 250 S.W.3d 471, 475 (Tex.App.--El Paso 2008, no pet.), *quoting De Leon*, 31 S.W.3d at 300.

C&C contends that it presented some evidence of Saab's breach of the U.S. 67 contract and raised the issue in its pleadings. In response, Saab advances five reasons why the trial court did not err in refusing the question: (1) Saab did not commit a prior material breach as a matter of law because the contract required written notice of a breach which was never sent; (2) the evidence is legally insufficient to support the submission of the questions; (3) C&C did not properly plead the defense; (4) the evidence is uncontroverted that C&C chose to continue the contract and now cannot claim a prior material breach which excuses its own performance; and (5) the questions C&C submitted could be rejected because they did not include conditioning instructions. We need only discuss the first and fourth of these claimed reasons.

*C&C never treated Saab's breach as material*

When one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance. *See Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex. 2004); *Hernandez v. Gulf Group Lloyds*, 875 S.W.2d 691, 692 (Tex. 1994) ("A fundamental principle of contract law is that when one party to a contract commits

a material breach of that contract, the other party is discharged or excused from any obligation to perform."). C&C's series of questions embody this idea, asking who breached the contract first. Presumably, had the jury found both parties breached but Saab breached first, C&C would then move for judgment on the verdict because any of its breaches were thereafter excused.

But when one party to a contract materially breaches, the non-breaching party must elect to either terminate the contract or treat it as continuing and thereafter continue its own performance. *See Hanks v. GAB Bus. Servs., Inc.*, 644 S.W.2d 707, 708 (Tex. 1982); *MKM Eng'rs, Inc. v. Guzder*, 476 S.W.3d 770, 783 (Tex.App.--Houston [14th Dist.] 2015, no pet.); *Gupta v. E. Idaho Tumor Institute, Inc.*, 140 S.W.3d 747, 756 (Tex.App.--Houston [14th Dist.] 2004, pet. denied). If the non-breaching party treats the contract as continuing and demands performance from the breaching party, then the non-breaching party must fully perform as well, because the contract continues in force for the benefit of both parties. *MKM Eng'rs*, 476 S.W.3d at 783; *Gupta*, 140 S.W.3d at 756-57. Stated otherwise, a party who elects to treat a contract as continuing deprives itself of any excuse for ceasing performance on its own part. *Long Trusts v. Griffin*, 222 S.W.3d 412, 415-16 (Tex. 2006); *Gupta*, 140 S.W.3d at 757. "These principles are well-known and unremarkable." *Gulshan Enterprises, Inc. v. Zafar, Inc.*, 530 S.W.3d 298, 303-04 (Tex.App.--Houston [14th Dist.] 2017, no pet.).

Accordingly, when faced with a claimed material breach, C&C was put to an election—continue with Saab or terminate and replace Saab. *Western Irrigation Co. v. Reeves County Land Co.*, 233 S.W.2d 599, 602 (Tex.App.--El Paso 1950, no writ). C&C urges that the contract had a "time is of the essence" clause and any delay by Saab therefore constituted a material breach as a matter of law. But here, faced with knowledge of Saab's alleged delay, C&C elected to require Saab to complete the contract. The evidence shows that when Saab tried to walk off the U.S. 67

10

job because it was not being paid, C&C prevailed on it to return to the job site. Edward Saab testified that Saab worked the final punchlist of items covering its work on the U.S. 67 project.[5] C&C might well have used any non-performance issues by Saab as reasons to offset what it owed, but it could not simply declare its obligations to Saab extinguished because of a pre-existing material breach. *Houston Belt & Terminal Ry. v. J. Weingarten, Inc.,* 421 S.W.2d 431, 435 (Tex.App.--Houston [1st Dist.] 1967, writ ref'd n.r.e.) ("If after a party breaches a contract, the other party continues to insist on performance on the part of the party in default, the previous breach constitutes no excuse for nonperformance on the part of the party not in default and the contract continues in force for the benefit of both parties."); *Western Irrigation Co.,* 233 S.W.2d at 602 (treating a contract as continuing after a breach deprives the non-breaching party of any excuse for terminating their own performance).

The jury questions that C&C submitted were relevant only to the extent that they might establish a complete defense to Saab's claim. C&C was not seeking damages for Saab's breach of the contract, nor does it complain of the omission of any damage question. Any such claim was in fact precluded by the partial summary judgment, not appealed here, that found any affirmative claim by C&C was barred by limitations. Given the jury's compromise verdict, there is little doubt that it considered Saab's performance in assessing the amount due under the contracts. Accordingly, we find no error, and certainly no harmful error in refusal of the defensive issue inquiring into Saab's breach.

*Condition Precedent or Covenant?*

---

[5] C&C provided some testimony that Saab did not finish the U.S. 385 project which C&C then finished, but it never admitted any evidence that it formally defaulted Saab under the contract. And C&C has not framed its issue on appeal to address the requested issues for the U.S. 385 contract.

We address one other of Saab's responses because it is integral to one of Saab's cross-points. Saab contends that C&C was not entitled to ask about any Saab breach, or to seek any offset of damages based on any claimed breach, because C&C never served a *written* notice of any claimed breach. Saab contends that written notice was a condition precedent to any claim of its own breach, and that failing such written notice, we can cabin and ignore any evidence in the record about Saab's claimed non-performance under the contract.

Paragraph nine of the U.S. 67 contract, titled "REMEDIES FOR NONPERFORMANCE" contains the following provisions which we bullet point in the order in which they appear to aide their readability:

- "The Subcontractor agrees to complete his Work as set forth in the basic Contract hereof at such time and in such manner that the progress of the Work will not be delayed."

- "*Should* the Subcontractor at any time refuse or neglect to supply a sufficiency of properly skilled workmen or of materials of the proper quality or fail in any respect to prosecute the work with promptness and diligence, or fail in the performance of any of the agreements herein contained, the Contractor shall be at liberty *after one day's written notice* to the Subcontractor to provide any such labor or materials and to deduct the cost thereof from any moneys thin [sic] due or thereafter to become due the Subcontractor under this Contract, and also to have privilege [sic] to terminate this Contract on one day's written notice to the Subcontractor."

- "If the Subcontractor shall be delinquent for the reasons just described or any other reason and as a result thereof, the Contractor is obliged to extend his supervision and overhead costs because of this particular delay, the Subcontractor shall be charged for the costs of such supervision and overhead; . . . ."

- "In addition, the Subcontractor shall reimburse the Contractor for any loss or damages, Including [sic] but not limited to any liquidated damages due to Owner under the General Contract or extra expense paid or incurred by the Contractor which is due to the Subcontractor's failure supply [sic] materials or labor or to perform properly the Work undertaken."

- "The Subcontractor shall properly amend and make good any defective materials and/or workmanship to the entire approval and acceptance of the Contractor and Owner and their authorized representatives. . . . *Should* the Subcontractor refuse or neglect to proceed at once with the correction of rejected or defective materials and/or workmanship *after receiving notice to do so*, it is agreed that the Contractor shall have the defects remedied or changes made at the expense of the Subcontractor, and the Subcontractor agrees to pay to

12

the Contractor on demand any and all loss and/or expense paid or incurred by the Contractor remedying such defects and/or making such changes, together with interest thereon, at the rate of 10% per annum, until paid, in additions [sic] to all other losses, damages and extra expense which the Subcontractor may become liable for under this Subcontract."

(Emphasis supplied). In another provision, the contract required that all notices "shall be in writing" and served by hand-delivery or sent by certified mail. Seizing on the italicized language in two of the provisions, Saab contends that the failure to serve written notice is fatal to any anticipatory breach or offset claim.[6]

C&C does not deny it failed to serve written notice. Rather, its owner contends he personally informed Edward Saab of the problems with Saab's performance but never sent any formal written notice because it would have put Saab "out of the business[.]" He also claimed that Edward Saab attended meetings with TXDOT officials when some of the same issues were discussed.

The issue before us is whether the notice provision is a "covenant" or a "condition precedent." "A condition precedent is an event that must happen or be performed before a right can accrue to enforce an obligation." *Centex Corp. v. Dalton*, 840 S.W.2d 952, 956 (Tex. 1992) (citations omitted); *see also* Restatement (Second) of Contracts § 224 (1981) ("A condition is an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due."). By contrast, a covenant is an agreement to act or refrain from acting in a certain way. *Solar Applications Engr., Inc. v. T.A. Operating Corp.*, 327 S.W.3d 104, 108 (Tex. 2010). "Breach of a covenant may give rise to a cause of action for damages, but does not affect the enforceability of the remaining provisions of the contract unless the breach is a material or total breach." *Id.*

---

[6] The U.S. 385 contract contained identical terms.

13

To distinguish between the two, we examine the entire contract, and as always, we seek the parties' intent. *See Criswell v. European Crossroads Shopping Ctr., Ltd.*, 792 S.W.2d 945, 948 (Tex. 1990). Texas public policy, however, disfavors conditions precedent. *Id.* ("[i]n construing a contract, forfeiture by finding a condition precedent is to be avoided when another reasonable reading of the contract is possible."). Thus, if the language of the contract is susceptible to a non-condition precedent interpretation, we accept that construction and construe the language as a mere covenant. *Id.* Nonetheless, parties can by clear language include notice and cure provisions as conditions precedent that courts will enforce. *E.g., Ogden v. Gibraltar Sav. Ass'n*, 640 S.W.2d 232, 233 (Tex. 1982) (maker of note must comply with acceleration clause requiring notice and cure period); *Cheung–Loon, LLC v. Cergon, Inc*., 392 S.W.3d 738, 745 (Tex.App.-- Dallas 2012, no pet.) (written notice and cure provision in commercial lease enforceable over claim that oral notice was provided); *Neurobehavioral Associates, P.A. v. Cypress Creek Hosp., Inc.*, 995 S.W.2d 326, 332 (Tex.App.--Houston [1st Dist.] 1999, no pet.) (reversing a summary judgment arising out of the cancellation of a services contract when the hospital failed to give thirty-day notice with an opportunity to cure).

Contract language that uses conditional language such as "if," "provided that," or "on condition that," reflects the parties intent to create a condition precedent. *Criswell*, 792 S.W.2d at 948. In this regard, Saab focuses on the word "should" in the second and fifth sentences of the clause pertaining to remedies. The word "should" can be used as a modal which imparts only a suggestion (i.e., "I should go to the park."). But it can also be used as a conditional word that replaces "if" (i.e., "Should the rain stop, you may go to the park."). Yet, even if we assume the word should is being used as a true conditional here, we disagree that it makes every possible Saab breach conditional on written notice. The second sentence in the remedies clause which contains

14

a requirement of written notice specifically allows C&C to deduct the cost of any "labor or materials" occasioned by Saab's non-performance. The third sentence, however, which does not have a written notice reference, allows C&C to charge back the cost of "supervision and overhead." The fourth sentence which begins with the words "in addition" and which has no reference to any written notice, states that Saab "shall reimburse the Contractor for any loss or damages, Including [sic] but not limited to any liquidated damages due to Owner under the General Contract or extra expense paid or incurred by the Contractor which is due to the Subcontractor's failure supply [sic] materials or labor or to perform properly the Work undertaken." The last sentence which does include the conditional "should" and includes a notice requirement, addresses defective work that Saab might have performed.

In deciding whether parties intended a condition precedent or covenant, a court must consider the entire contract. *Arbor Windsor Ct., Ltd. v. Weekley Homes, LP*, 463 S.W.3d 131, 136 (Tex.App.--Houston [14th Dist.] 2015, pet. denied), *citing Criswell*, 792 S.W.2d at 948. And in doing so, we find another provision in which C&C retained the right to charge back costs and expenses that are not conditioned on any notice provision. In paragraph six, titled "DELAYS," the parties agreed as follows:

> Any fines, penalties or other expenses incurred by Contractor as a result of delays in the Work caused by Subcontractor shall be deducted by Contractor from the contract price herein as partial liquidated damages. Contractor and Subcontractor agree that upon the execution of this Agreement, damages caused by delays in the Work caused by Subcontractor, if any, are unascertainable and difficult to estimate and that any deductions from the contract price herein are not intended as a penalty against Subcontractor. Subcontractor shall be liable to Contractor for any fines, penalties and expenses, which exceed the contract price herein and shall pay such amount to Contractor upon demand.

Nothing in this provision refers to a notice and cure period. The mere existence of conditional language within a contract does not suggest that all obligations of one party are conditions precedent to the performance by the other party. *See Solar Applications,* 327 S.W.3d at 110 (so

15

holding); *Arbor Windsor*, 463 S.W.3d at 136–38; *see also Landscape Design & Constr., Inc. v. Harold Thomas Excavating, Inc.*, 604 S.W.2d 374, 377 (Tex.App.--Dallas 1980, writ ref'd n.r.e.) (agreement to perform contract in ten days, was not tied to conditional payment language found in separate paragraph).

The parties knew how to make an obligation expressly conditional on a preceding event. A clause labeled "CONDITION TO PAYMENTS" reads:

> All progress payment and final payment mentioned in this Subcontract Agreement are contingent and subject to Owners [sic] acceptance of all Work performed by Subcontractor and General Contractors receipt of payment from Owner for Subcontractors [sic] Work and Contractors [sic] Work . . . .
>
> Subcontractor further agrees that Owners [sic] payments and final payment for any work performed by Subcontractors and General Contractor shall be an express condition precedent to any obligation of General Contractor to make any progress payments, retainage, or final payment to Subcontractor."

We also note that the liquidated damages for delays that TXDOT might assess comes at the end of the project, after the work is complete. The one-day notice period would be moot at that point, because no cure would even be possible. Accordingly, we find the notice provision to be a covenant and not a condition precedent. The failure to provide written notice is not an absolute bar to considering the evidence of Saab's claimed breaches. But as we have also concluded, those claimed breaches would not be an absolute defense to Saab's claim, and thus, failing to submit a question on the claimed breach was not harmful error. We overrule C&C's two issues presented.

### The Trial Court did not err in refusing Saab's JNOV on actual damages

Saab filed a motion for judgment notwithstanding the verdict which asked that the trial court impose the full measure of damages that Saab sought at trial. The trial court declined to do so, which forms the basis of Saab's first cross-point on appeal.

*Standard of Review*

16

We cannot discard the jury's finding on damages as a matter of law unless "no evidence" supported the finding. *See Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 227 (Tex. 1990). No evidence means: (1) the complete absence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla; or (4) the evidence conclusively establishes the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). A scintilla of evidence denotes that quantum of proof that "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex. 1995) (citation omitted). In review of the record, we credit favorable evidence if a reasonable fact finder could, and disregard contrary evidence unless a reasonable fact finder could not. *City of Keller*, 168 S.W.3d at 827. We view the evidence and possible inferences in the light most favorable to the verdict. *Mancorp, Inc.*, 802 S.W.2d at 227. Moreover, a court may disregard the jury's negative finding and substitute its own affirmative finding only if the evidence conclusively establishes the affirmative finding. *See* TEX.R.CIV.P. 301; *Brown v. Bank of Galveston, Nat'l Ass'n*, 930 S.W.2d 140, 145 (Tex.App.--Houston [14th Dist.] 1996), *aff'd,* 963 S.W.2d 511, 515-16 (Tex. 1998).

Saab's argument turns on two main tenants. First, any reduction in the amount of Saab's claim cannot be considered as a matter of law because C&C failed to send written notice of any performance deficiency. For the reasons we discuss above, we reject the contention that the Remedies Clause contains a condition precedent to that effect.

Saab's second argument is that C&C never quantified the degree to which Saab's conduct would offset the amount due, thus we cannot consider it at all. Saab focuses on the delay penalties that TXDOT assessed against C&C—$57,500 on the U.S. 67 contract and $28,125 on the U.S.

17

385 contract. Saab argues that some of the delays were attributable to C&C or its other subcontractors, and without some segregation, the jury could not consider any amount for offset purposes. It notes that Jo Ann Von Holstein, C&C's office manager, was specifically instructed not to try and allocate any of the liquidated damages between Saab and other entities.

Nonetheless, we reject Saab's argument. Plaintiffs have the burden to prove their damages with a reasonable degree of certainty, but not necessarily with mathematical precision. *Lakeside Village Homeowners Assn., Inc. v. Belanger*, 545 S.W.3d 15, 42 (Tex.App.--El Paso 2017, pet. denied) (collecting cases). We might agree the same rule would apply to offsets that a breaching party wishes to urge. *See Bausch & Lomb Inc. v. Bressler*, 977 F.2d 720, 729 (2nd Cir. 1992) (noting reliance recovery could be offset by the amount the breaching party can show with "reasonable certainty"). Here, the jury heard two and one-half days of testimony spanning some 745 pages where the parties litigated their competing theories of who should bear responsibility for the problems that arose on both projects. In the 599 pages of exhibits, the jury would have found reports from TXDOT inspectors discussing problems encountered on specific days that in conjunction with the trial testimony could be attributable to one or the other party. The jury also had before it the interim payment applications showing the progress of the work. And importantly here, Saab does not claim that the jury's verdict is against the great weight and preponderance of the evidence such that it seeks a new trial on damages. Rather, it contends the evidence proves the specific amount it seeks as a matter of law. On review, we conclude that the evidence showed some play in the amount of damages under both contracts.

Under the U.S. 67 project, TXDOT imposed $57,500 in delay damages, even a portion of which would account for the jury's $17,856.94 reduction from Saab's damage model. On the U.S. 385 project, TXDOT assessed $28,125 in delay damages which could account for a substantial

18

part of the $37,003.62 reduction in damages. C&C also presented testimony that it reduced the payment application by another $26,620 based on a pricing discrepancy.

Edward Saab presented Saab's damage model through two summary exhibits. Together, the two exhibits totaled $115,305.45. Edward Saab filed an affidavit attached to Saab's Fifth Amended Petition attesting to the same amount. But earlier affidavits by Edward Saab attached to earlier petitions had claimed different amounts ($101,416.75, $328,623.82, $123,796.99 and $76,519.83) Saab contended that these changing figures reflected its changing analysis as discovery progressed. A reasonable jury, however, might have concluded that the variance reflected on Edward Saab's credibility in estimating his company's loss.

On the U.S. 385 project, Edward Saab included a $79,000 increase in the contract price which under the letter of the contract, would have required a signed changed order. He acknowledged the lack of that change order but requested the amount because "[w]e did the work." Finally, as Saab received partial payments, it signed releases of lien that covered all "materials and/or equipment furnished and work completed" through specific dates. Edward Saab denied that these releases in fact released all the prior work because the progress payments were considered mere estimates. He agreed the release forms, however, never used the word estimates. For both projects, Alfredo Corral estimated that C&C spent $40,000 on extra flex-base material that Saab had ordered, but that C&C had to eventually go out and pick-up from the worksite.

Based on the issue before us, we are concerned only with whether the evidence proved as a matter of law the full measure of damages that Saab claimed. Because Saab does not meet that burden, we overrule its first cross-point.

### The Trial Court erred in not awarding appellate attorney's fees

We reach a different result, however, on Saab's second cross-point that complains of the jury's zero answer for appellate attorney's fees. Saab's attorney testified to the amount of trial and appellate attorney's fees necessary to prosecute the breach of contract claim. The attorney testified to an hourly rate for himself, another attorney in the office, and a paralegal. The attorney testified to the amount of fees incurred through trial and admitted into evidence the firm's invoices.

Additionally, if the case was appealed, the attorney testified that the following fees would be reasonable and necessary: (1) $30,000 through proceedings at the court of appeals, (2) $7,500 if a petition for review is filed at the Texas Supreme Court, and (3) an additional $22,500 if the Texas Supreme Court ordered full briefing and heard oral argument. The attorney based these estimates on his experience in handling ten to fifteen previous appeals. He also testified that the estimate for the stage at the court of appeals was the mid-point between what C&C had estimated for its own attorney's fees on appeal at that stage.

C&C cross-examined Saab's attorney on the necessity of the fee amount sought for the trial of the case. The cross-examination largely focused on the total of the trial attorney's fees sought in relation to the amount in controversy, and whether the jury could compromise the amount of the fee if the jury compromised the amount of the claim. C&C did not directly challenge the amounts sought for appeal.

The jury awarded Saab only a portion of the attorney's fees that it sought for trial. Relevant to the cross-point, the jury found zero dollars for each of the following subpart questions on attorney's fees (1) an appeal to this Court, (2) the petition for review stage at the Texas Supreme Court, (3) merits briefing at the Texas Supreme Court, and (4) representation through oral argument at the Texas Supreme Court.

*Standard of Review and Controlling Law*

20

Section 38.001 provides that a "person may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for . . . (8) an oral or written contract." TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(8). Although the statute uses the term "may," the Texas Supreme Court has held that a trial court has no discretion to deny an award of reasonable and necessary attorney's fees under this statute when presented with evidence of the same. *See Bocquet v. Herring*, 972 S.W.2d 19, 20 (Tex. 1998); *see also Ventling v. Johnson*, 466 S.W.3d 143, 154 (Tex. 2015) (discussing an award of attorney's fees on appeal); *Siam v. Mt. Vista Builders*, 544 S.W.3d 504, 509-10 (Tex.App.--El Paso 2018, no pet.). This limited discretion furthers Section 38.001's purpose which is to "encourage contracting parties to pay their just debts and discourage . . . vexatious, time-consuming and unnecessary litigation." *Ventling*, 466 S.W.3d at 155, *quoting Gates v. City of Dallas*, 704 S.W.2d 737, 740 (Tex. 1986) (construing chapter 38's predecessor). Thus, while a trial court has the discretion to determine the amount of reasonable and necessary attorney's fees, it has no discretion to award a party no fees when presented with credible evidence of the amount of attorney's fees a party incurred. *See Ventling*, 466 S.W.3d at 155; *see also Midland W. Bldg. L.L.C. v. First Serv. Air Conditioning Contractors, Inc.*, 300 S.W.3d 738, 739 (Tex. 2009) (per curiam) (award of no attorney's fees in action on a sworn account was improper in the absence of evidence affirmatively showing that no attorney's services were needed or that services provided were of no value). If trial attorney's fees are mandatory under Section 38.001, then appellate attorney's fees are likewise mandatory if they are properly proved. *Ventling*, 466 S.W.3d at 154; *Karam v. Brown*, 407 S.W.3d 464, 475 (Tex.App.--El Paso 2013, no pet.).

Saab complains of the jury's negative finding for appellate attorney's fees and asks that we render judgment in its favor based on the trial testimony. A court may disregard the jury's negative

21

finding and substitute its own affirmative finding only if the evidence conclusively establishes the affirmative finding. *See Brown*, 930 S.W.2d at 145.

Ordinarily, the reasonableness of the amount of an attorney's fee award is left to the fact finder, and a reviewing court may not substitute its own judgment on the amount to be awarded for the judgment of the fact finder. *See Smith v. Patrick W.Y. Tam Trust*, 296 S.W.3d 545, 547 (Tex. 2009); *see also Bocquet*, 972 S.W.2d at 21 (noting that reasonableness and necessity of attorney's fees are "question[s] of fact for the jury's determination"). However, when the evidence is clear, direct, positive, and not contradicted by any other witness or attendant circumstances, and is otherwise free from "contradiction, inaccuracies, and circumstances tending to cast suspicion thereon," an appellate court may exercise its discretion and render judgment for attorney's fees in the interest of judicial economy without the necessity of remanding the matter to the trial court for a new trial on that issue *See Ragsdale v. Progressive Voters League*, 801 S.W.2d 880, 882 (Tex. 1990); *see also In re Guardianship Estate of Del Campo*, 346 S.W.3d 701, 703-04 (Tex.App.--El Paso 2009, no pet.) (court reformed the trial court's judgment to include an award of attorney's fees in the amount requested by the prevailing party, where it presented clear and uncontradicted evidence of the fees incurred, and there was nothing in the record to call into question the reasonableness of the amount requested); *Elias v. Mr. Yamaha, Inc.,* 33 S.W.3d 54, 62-64 (Tex.App.--El Paso 2000, no pet.) (court reformed the trial court's judgment to reflect the full amount of attorney's fees requested by prevailing party where none of the surrounding circumstances of the case indicated that the amount requested was "incredible or unreasonable").

Yet one of the circumstances that might cause a jury to compromise attorney's fees is when the jury compromises the amount of the underlying recovery. In *Patrick W.Y. Tam Trust,* the jury awarded the plaintiff about a third of what it sought in actual damages, and nothing for attorney's

22

fees. 296 S.W.3d at 546. The plaintiff's attorney put on uncontroverted evidence of $47,438.75 in attorney's fees for trial of the case. *Id*. The court of appeals rendered judgment that the plaintiff should recover that entire amount for attorney's fees at trial. The Texas Supreme Court reversed that holding. It noted that two factors in determining the amount of an appropriate fee are the amount at issue and results obtained. *Id*. at 548. The jury had greatly reduced the amount of damages sought and correspondingly could have (but was not required to) reduce the amount of attorney's fees. The court agreed that a zero award was improper, but it held that court of appeals should have ordered new trial on the amount of attorney's fees to be awarded, rather than reforming trial court's award of attorney's fees to include the full amount requested by prevailing party. *Id*. at 547-48.

On the record before us, the evidence is uncontradicted as to an amount of appellate attorney's fees through two stages of the appellate process—an appeal to this Court and the petition for review stage at the Texas Supreme Court. Saab presented uncontradicted testimony that a reasonable fee for an appeal of this case to the court of appeals totaled $30,000 and that a fee of $7,500 was warranted for a petition for review to the Texas Supreme Court. Nevertheless, like the jury in *Patrick W.Y. Tam Trust*, this jury compromised the amount that Saab sought, and compromised the amount of attorney's fees it sought. We likewise conclude that the jury improperly compromised the amount of the appellate attorney's fee to zero. The jury could not find zero, it needed to find some amount supported by the evidence. And like the court in *Patrick W.Y. Tam Trust,* we remand the appellate attorney's fee for a new trial.[7]

---

[7] In *Patrick W.Y. Tam Trust*, the trial court granted a JNOV that awarded the plaintiff $15,000 in appellate attorney's fees, which the court of appeals affirmed, and which was not remanded as part of the Texas Supreme Court's judgment. From what we can tell from the petition for review, the defendant never challenged the award of appellate fees, and it was not at issue before the Texas Supreme Court. Nonetheless, the same factors that inform a fact finder for attorney's fees at the trial court should also apply to appellate attorney's fee, and the holding of *Patrick W.Y. Tam Trust* equally applies to an award of appellate attorney's fees.

23

We would remand the entire appellate attorney fee question for another reason. The testimony at trial set out the amounts required for each stage of the appellate process. The stages discussed in the trial testimony, however, did not exactly correspond to the appellate stages in the jury question. The attorney witness testified to a single sum of $22,500 for merits briefing at the Texas Supreme Court and oral argument if the petition for review is granted. The jury charge, however, appropriately broke the inquiry into two distinct parts: (1) merits briefing and (2) representation through oral argument at the Texas Supreme Court. In a petition for review, the Texas Supreme Court can order full briefing on the merits without granting the petition or setting oral argument. TEX.R.APP.P. 55.1. We are unaware of any authority that allows an appellate court to simply divide an aggregate estimate for attorney's fees for two stages of the appellate process into component parts. Because we would remand this portion of the appellate fee in any event, we believe judicial economy is best served by remanding the entire appellate fee question as well. To be clear, nothing in our opinion should be read to suggest that the fact finder must compromise the estimates for appellate fees that Saab testified to at trial. It may or may not and will certainly have the benefit of the billing records for the amounts incurred in the appeal to date. Thus, we sustain Saab's second cross-point.

## CONCLUSION

We overrule C&C's two issues on appeal. We overrule Saab's first cross-point and affirm the judgment on actual damages. After sustaining Saab's second cross-point, we reverse that portion of the judgment that denies appellate attorney's fees, and remand for a new trial limited to the issue of appellate attorney's fees.

GINA M. PALAFOX, Justice

March 29, 2019

24

Before Rodriguez, J., Palafox, J., and Larsen, J. (Senior Judge)
Larsen, J. (Senior Judge), sitting by assignment