**Reversed and Rendered in Part, Reversed and Remanded in Part, and Opinion filed May 26, 2022.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-20-00544-CV

---

**BACHTELL ENTERPRISES, LLC; YAZOO VENTURE, LLC; CRAFT OPERATING COMPANY II, LLC; CRAFT OPERATING COMPANY IV, LLC; CRAFT OPERATING COMPANY XV, LLC; CRAFT OPERATING COMPANY XVI, LLC; CRAFT OPERATING COMPANY XXV, LLC; CRAFT OPERATING COMPANY XXX, LLC; AND CRAFT EXPLORATION COMPANY, LLC; Appellants**

**V.**

**ANKOR E&P HOLDINGS CORPORATION, Appellee**

---

**On Appeal from the 61st District Court
Harris County, Texas
Trial Court Cause No. 2016-18033**

---

### OPINION

How far does an exculpatory clause in a joint operating agreement (JOA) extend to exonerate an operator of oil and gas projects? The parties signed JOAs for the development and production of oil, gas, and other minerals. A dispute arose

after the operator intentionally passed expenses to the nonoperator investors without their consent. Concluding that the exculpatory clause in this case did not allow the operator to knowingly assign unauthorized charges to the nonoperators, we reverse the trial court's judgment and reinstate the jury verdict in favor of the nonoperators. We also reverse a damages and attorney's fees award in favor of the operator based on the jury's prior material breach finding and remand for a new trial on appellate attorney's fees.

*Background*

Ankor E&P Holdings Corporation was the operator that directed projects under the JOAs. Various nonoperators agreed to participate in specific projects. The projects were referred to as prospects, and participating nonoperators signed individual JOAs for each prospect.

Ankor began negotiating with CDM Max to construct a gas production plant for a project called the Old Home Project.[1] Ankor then prepared a memorandum informing the nonoperators that CDM would bankroll the construction of, own, and operate the plant. Ankor stated in the memorandum that third-party ownership of the plant would, among other things, "eliminate[] the need for the [nonoperators] to provide capital for construction." Ankor attached Authority for Expenditures (AFE) forms authorizing Ankor to purchase the site for the plant, pipeline rights of way, and engineering studies. The nonoperators agreed to those AFEs, totaling approximately $385,000. Ankor also stated that additional AFEs would be provided "at an appropriate time to cover additional [right of way] acreage, and the laying of gas gathering pipelines."

---

[1] The appellants in this case are nonoperators that participated in the Old Home Project. For purposes of this opinion, we refer to appellants as "the nonoperators" unless otherwise specified.

2

The applicable JOAs required Ankor to acquire consent from all parties to "undertake any single project reasonably estimated to require an expenditure in excess of" $50,000. The JOAs all included an exculpatory clause that provided Ankor would

> [c]onduct its activities under this Agreement as a reasonably prudent Operator, i.e., in a good and workmanlike manner, with due diligence and dispatch, in accordance with good oilfield practice, in compliance with applicable law and regulation. It shall have no liability as Operator to the other parties for losses sustained or liabilities incurred, except such as may result from willful misconduct. Non-Operators agree to indemnify, defend and hold Operator harmless from and against all losses sustained or liabilities incurred in the operation of the Contract Area, except such as may result from [Ankor's] gross negligence or willful misconduct.

Ankor signed a service agreement with CDM.[2] The service agreement included a confidentiality clause and a clause committing a portion of gas produced at the plant to CDM. Approximately one year later, Ankor sent a memo to the nonoperators stating that until the plant was paid off, CDM would "retain[] all plant revenue as credit towards the full operating costs, transfer and fractionation fees, and amortized capital. Any balance due [CDM] is born by the Ownership. The balance . . . due [CDM] is approximately $1,590,000." Ankor then sent the nonoperators a joint interest billing statement (JIB) totaling $1.6 million. According to the nonoperators, Ankor refused to let them see the service agreement on the basis that it included a confidentiality clause. The nonoperators subsequently stopped paying JIBs and objected in writing.

Ankor filed this lawsuit against the nonoperators claiming breach of the prospect JOAs for failure to pay the JIBs. The nonoperators (with Bachtell Enterprises, LLC as an intervenor) counterclaimed for fraud, money had and

---

[2] CDM was later renamed Plains Gas Solutions but is referred to in this opinion as CDM.

3

received, and breach of the JOAs. The nonoperators alleged that Ankor breached the JOAs by, in relevant part, (1) charging for gas plant construction without consent, (2) withholding revenue without consent or contractual authority, (3) committing the nonoperators' gas to CDM without authority, (4) agreeing not to disclose the CDM service agreement to the nonoperators, and (5) charging the nonoperators unauthorized attorney's fees.

The jury found that both Ankor and the nonoperators failed to comply with the JOAs but Ankor committed the first material breach. The jury also found that Ankor's failure to comply was not the result of "willful misconduct." The jury awarded damages and attorney's fees to both Ankor and the nonoperators. The trial court granted Ankor's motion for entry of judgment and rendered judgment awarding damages and attorney's fees to Ankor and a take nothing judgment against the nonoperators.

## *Discussion*

The nonoperators bring seven issues on appeal challenging the trial court's judgment in favor of Ankor. We first address the applicability of the exculpatory clause, next whether the jury's prior material breach finding is a defense to liability, and then whether the nonoperators are entitled to attorney's fees. We do not reach the nonoperators' remaining issues.

### I.    Exculpatory Clause Does Not Apply

In their first issue, the nonoperators argue that the exculpatory clause does not apply because "Ankor unilaterally reimbursed itself for the liability it incurred to CDM by withholding the Non-Operators' oil revenues, even though the JOAs prohibit this." Ankor does not challenge the finding that it breached the JOAs. Instead, Ankor argues that the exculpatory clause broadly covers all its alleged

4

conduct because the losses sustained or liabilities incurred, if any, did not result from willful misconduct.

**Preservation of Error**. As an initial matter, we address whether this issue was preserved for our review. The trial court submitted a question asking the jury, "Do you find that ANKOR's failure to comply with the JOAs was the result of willful misconduct on the part of ANKOR?" The jury answered no. The nonoperators argue this question is immaterial because the exculpatory clause does not apply. The nonoperators did not object to the trial court's submission of the question below but argued in a motion for new trial that the question was immaterial.

A complaint that a jury's answer is immaterial is not a jury-charge complaint that must be raised before the jury deliberates. *Musallam v. Ali*, 560 S.W.3d 636, 640 (Tex. 2018); *Orr v. Broussard*, 565 S.W.3d 415, 421 (Tex. App.—Houston [14th Dist.] 2018, no pet.). A party can instead preserve a materiality complaint by raising the issue in a motion for judgment notwithstanding the verdict, a motion to disregard the finding, or a motion for new trial. *Orr*, 565 S.W.3d at 421 (citing *BP Am. Prod. Co. v. Red Deer Res., LLC*, 526 S.W.3d 389, 402 (Tex. 2017)). Because the nonoperators argued in the motion for new trial that the jury's finding on willful misconduct was immaterial, this argument has been preserved for review. *See id*.

Ankor also argues that the nonoperators did not preserve error on their theory that Ankor breached the JOAs by incurring liabilities without the nonoperators' consent. The nonoperators contend "[t]he gravamen of this entire suit is that Ankor never got . . . required written consent . . . for more than a million dollars in capital costs for a gas production plant, [which were] costs that Ankor told the Non-Operators they would not have to [pay] but then deducted from the

Non-Operators' revenues." According to Ankor, to preserve error, the nonoperators were required but failed to obtain any jury findings on this issue. The jury found simply that Ankor "failed to comply with the JOAs."

Trial courts are required to submit broad-form questions in their jury charge whenever feasible. Tex. R. Civ. P. 277. An exception applies "when a jury bases a finding of liability on a single broad-form question that commingles invalid theories of liability with valid theories, [because] the appellate court is often unable to determine the effect of this error." *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 388 (Tex. 2000). Here, Ankor does not argue that the nonoperators submitted a single broad-form liability question that commingled valid and invalid liability theories. In fact, the only liability theory presented to the jury was based on Ankor's failure to obtain consent before making certain expenditures. The broad-form jury question was adequate to preserve error. *See Bed, Bath & Beyond, Inc. v. Urista*, 211 S.W.3d 753, 757 (Tex. 2006) ("When, as here, the broad-form questions submitted a single liability theory (negligence) to the jury, *Casteel's* multiple-liability-theory analysis does not apply."); *see also Powell Elec. Sys., Inc. v. Hewlett Packard Co.*, 356 S.W.3d 113, 124 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (holding that a broad-form jury question on breach of contract was adequate because it covered a single theory of liability based on various factual allegations).

Here, the factual basis for the nonoperators' breach of contract theory based on consent was the consistent theme presented to the jury. During opening statements, the nonoperators' attorney repeatedly mentioned consent, e.g., "one of the two big pieces of this case. . . [c]onsent"; "consent . . . the right to say no before someone spends your money, is one of the most fundamental rights that we have"; "our right to consent or refuse to consent before our money gets spent, came

6

from the contract"; Ankor "took from us over two million dollars [of] our revenue to pay for a gas processing plant without our consent"; "a very simple obligation, before you spend our money or at least over $50,000 . . . you come to us [and] ask us to agree to it"; "What this case is about is how Ankor treated our money. It's about consent." During closing arguments, the nonoperators' attorney reiterated this theme, e.g., "At the beginning of this trial, [we] told you this case was about consent and fraud"; "[c]onsent, the right to vote, the right to decide, the right to make an election"; "[w]ithout the consent of all parties, operator shall not undertake any project reasonably estimated to require an expenditure in excess of $15,000"; "[l]adies and gentlemen, we talked about this from when we first met . . . . Her Honor bestowed upon you the sacred right to vote an election. Ankor took that right from my clients." And the jury's damages award aligned with the nonoperators' theory of the case: the award matched the evidence of expenditures for the gas plant production costs. We conclude that the nonoperators preserved error as to their argument that Ankor did not obtain consent to the gas plant production costs.

**Applicability of Exculpatory Clause**. The parties rely on the same caselaw to reach different conclusions: *Reeder v. Wood County Energy, LLC*, 395 S.W.3d 789 (Tex. 2012). In the *Reeder* case, the supreme court held that an exculpatory clause with similar language "exempt[ed] the operator from liability for its activities unless its liability-causing conduct [was] due to gross negligence or willful misconduct." *Id*. at 795.

According to the nonoperators, for us to interpret the exculpatory clause to excuse Ankor from the intentional breaches of contract alleged here would be extending the reach of *Reeder* too far, particularly in light of other clauses in the JOAs (1) requiring individual liability for performance of each party's obligations,

7

(2) requiring consent for any project requiring an expenditure of over $50,000, and (3) prohibiting Ankor from withholding oil revenues to reimburse costs in the absence of a nonoperator delinquency. Ankor contends, to the contrary, that *Reeder* requires the court to broadly define "activities" to include even intentional breaches of contract that do not rise to the level of willful misconduct. The nonoperators counter that "Ankor's interpretation of the exculpatory provision turns [it] into a provision that allows the operator to impose liability on the Non-Operators when it is intended only to be a shield to the Operator's liability."

Interpretation of an unambiguous contract is a question of law we review de novo. *URI, Inc. v. Kleberg Cty.*, 543 S.W.3d 755, 763 (Tex. 2018). Our objective is to "ascertain the true intentions of the parties as expressed in the writing itself," beginning with the instrument's express language. *Nettye Engler Energy, LP v. BlueStone Nat. Res. II, LLC*, 639 S.W.3d 682, 689 (Tex. 2022); *see also Reeder*, 395 S.W.3d at 795. We give terms their plain and ordinary meaning unless the contract indicates that the parties intended a different or technical meaning. *Nettye*, 639 S.W.3d at 690. We consider the entire contract, respecting all provisions so that none are rendered meaningless. *Id*. If possible, we avoid a construction that is unreasonable, inequitable, or oppressive. *BBVA USA v. Francis*, 642 S.W.3d 932, 936 (Tex. App.—Houston [14th Dist.] Mar. 3, 2022, no pet. h.).

First, we address the language of the JOAs. Then, we address the applicable caselaw. The JOAs include a section entitled "Liability of Parties," setting forth that "[t]he liability of the parties shall be several, not joint or collective" and [e]ach party shall be responsible only for its obligations, and shall be liable only for its proportionate share of the costs of developing and operating the Contract Area." Moreover, the JOAs include numerous provisions requiring consent. In relevant part, Ankor agreed not to "undertake any single project reasonably estimated to

8

require an expenditure in excess of [$50,000 w]ithout the consent of all parties." Ankor also agreed not to "hold itself out as . . . the agent of the Non-Operators with authority to bind them to any obligation or liability assumed or incurred by [Ankor] vis-à-vis any third party." And Ankor was allowed to withhold the nonoperators' oil revenues only upon delinquent payment of any JIB after providing notice to the nonoperators. We construe the exculpatory clause in light of the entire contract, including these crucial sections. *See Nettye*, 639 S.W.3d at 690.

An exculpatory clause is a "clause in a contract designed to relieve one party of liability to the other for specified injury or loss incurred in the performance of the contract." *Reeder*, 395 S.W.3d at 792–93. In *Reeder*, the supreme court construed the following exculpatory clause in a JOA:

> Operator shall conduct its activities under this agreement as a reasonable prudent operator, in a good and workmanlike manner, with due diligence and in accordance with good oilfield practice, but in no event shall it have any liability as Operator to the other parties for losses sustained or liabilities incurred except such as may result from gross negligence or willful misconduct.

*Id*. at 793.

The high court held that the use of the term "activities" broadened the scope of the exculpatory clause to include "actions under the JOA that are not limited to operations." *Id*. at 795. This standard "exempts the operator from liability for its activities unless its liability-causing conduct is due to gross negligence or willful misconduct." *Id*.

The exculpatory clause in this case is not substantively different from the exculpatory clause in *Reeder*, but the facts are. The operator in the *Reeder* case alleged that four wells required extensive testing or repairs and sought funding

9

from his business partners, who denied the request. *Id*. at 791. Because the needed repairs were not made, according to the operator, Reeder, the Texas Railroad Commission suspended oil production from one of the oil bearing formations in the operation. *Id*. Reeder asserted that he spent at least $150,000 of his own money to try to preserve operations. *Id*. Reeder sued, and the investors countersued, alleging, among other things that any damages were caused by Reeder as operator. *Id*. at 792. After the case went to trial, the jury found that Reeder breached his duty as operator "by failing to maintain production in paying quantities or other operations." *Id*.

In construing the contract, the supreme court held that the exculpatory clause envisioned "actions under the JOA that [were] not limited to operations" and "exempt[ed] the operator from liability for its activities unless its liability-causing conduct is due to gross negligence or willful misconduct." *Id*. at 794. But the court did not define the breadth of "activities" and did not broadly hold that "activities" encompasses all intentional breaches of a joint operating agreement.

The question squarely before us, as an apparent matter of first impression, is whether "activities" is so broad as to protect an operator from any breach of contract so that the operator can have no liability for breach of any contractual provision, absent willfulness. We decline to extend the reach of *Reeder* that far. As the *Reeder* court noted, exculpatory clauses are "designed to relieve one party of liability to the other for specified injury or loss incurred in the performance of the contract." *Id*. at 792–93. In other words, it is a defense designed to protect one party against risks and losses, but it is not meant for offensive use to impose liabilities knowingly incurred without consent.

As we have noted, the purpose of an exculpatory clause in a joint operating agreement is to protect the operator from liability "to nonoperators for injury

10

caused by the operator's *ordinary negligence*." *Crimson Expl. Operating, Inc. v. BPX Operating Co.*, No. 14-20-00070-CV, 2021 WL 786541, at *4 (Tex. App.—Houston [14th Dist.] Mar. 2, 2021, pet. denied) (mem. op.) (emphasis added). No precedent requires us to extend that protection further than negligent injury. *See, e.g., Reeder*, 395 S.W.3d at 792–93; *Apache Corp. v. Castex Offshore, Inc.*, 626 S.W.3d 371, 394 (Tex. App.—Houston [14th Dist.] 2021, pet. filed) ("If the breach was the result of ordinary negligence, then the non-operator has no recourse."); *Crimson Expl. Operating*, 2021 WL 786541, at *4; *cf. Zachry Const. Corp. v. Port of Houston Auth. of Harris Cty.*, 449 S.W.3d 98, 116 (Tex. 2014) (holding contractual provisions "exempting a party from tort liability for harm caused intentionally or recklessly [are] unenforceable on grounds of public policy").[3] Moreover, our job is to "construe contracts from a utilitarian standpoint bearing in mind the particular business activity sought to be served, and avoiding unreasonable constructions when possible and proper." *See Plains Expl. & Prod. Co. v. Torch Energy Advisors Inc.*, 473 S.W.3d 296, 305 (Tex. 2015).

In this case, Ankor was required under the JOAs to obtain consent for charges over $50,000, which it admittedly did not do. Ankor contends that in the event of a conflict among provisions in the JOAs, the exculpatory clause controls. However, the nonoperators do not assert that there is a conflict among JOA provisions, and we see no conflict among these provisions because the allegations against Ankor are not based on activities envisioned by the exculpatory clause. Reading the JOAs in their entirety, as we must, we conclude that the exculpatory clause does not apply under these circumstances. Accordingly, the trial court erred

---

[3] The facts of *Crimson Exploration Operating*, as in *Reeder*, also involved alleged negligence by the operator and thus are distinguishable from the facts of this case. *See* 2021 WL 786541, at *1-2 (involving allegation that operator "deviated from its past practices and against its geologist's advice, using knowingly substandard methods and materials").

in rendering a take nothing judgment against the nonoperators. We sustain the nonoperators' first issue.

## II.    Jury Finding on Prior Material Breach Controls

The nonoperators contend in their second issue that the jury's affirmative finding against Ankor on material breach excused the nonoperators from their payment obligations, and thus the trial court erred in rendering judgment in favor of Ankor. When one party to a contract materially breaches that contract, the other party generally is discharged or excused from further performance. *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex. 2004) (per curiam). Specifically, in this context, a material breach by Ankor would have excused the nonoperators from making further contractual payments. *See Bartush-Schnitzius Foods Co. v. Cimco Refrigeration, Inc.*, 518 S.W.3d 432, 436 (Tex. 2017) (per curiam). The jury found that Ankor's breach of contract was "first" and "material."

Ankor asserts that the trial court properly disregarded the jury's prior material breach finding on the basis that the jury also found Ankor's actions did not constitute willful misconduct and thus Ankor's prior material breach was excused. Because the exculpatory clause does not apply under these circumstances, the jury's finding on willful misconduct was immaterial, and we disregard that finding. *See Orr*, 565 S.W.3d at 422 ("A question is immaterial if it has been rendered immaterial by other findings or if it should not have been submitted at all.").

Ankor also argues that the nonoperators' continued participation under the JOAs after the alleged prior material breach precludes the defense of prior material breach. Ankor did not challenge the jury's prior material breach finding below. Any such challenge has therefore been waived. *See Apache Corp.*, 626 S.W.3d at

12

394. We sustain the nonoperators' second issue.[4]

### III. Remand for Attorney's Fees

In their fourth issue, the nonoperators request an award of attorney's fees and a remand for a new trial on appellate attorney's fees because the jury awarded zero appellate attorney's fees. The JOAs require an award of attorney's fees to the prevailing party. *See Intercontinental Grp. P'ship v. KB Home Lone Star L.P.*, 295 S.W.3d 650, 653 (Tex. 2009) ("[A]ttorney's fees are recoverable . . . if authorized by . . . a contract between the parties."). Because we reverse and render judgment in favor of the nonoperators, we also reverse the attorney's fees awarded by the jury in favor of Ankor and reinstate the attorney's fees awarded by the jury in favor of the nonoperators. In addition, we remand for a new trial on appellate attorney's fees. *See, e.g., Midland W. Bldg. L.L.C. v. First Serv. Air Conditioning Contractors, Inc.*, 300 S.W.3d 738, 739 (Tex. 2009) ("While the jury could have rationally concluded that a reasonable and necessary fee was less than the amount sought, an award of no fees was improper in the absence of evidence affirmatively showing that no attorney's services were needed or that any services provided were of no value."); *C&C Rd. Constr., Inc. v. SAAB Site Contractors, L.P.*, 574 S.W.3d 576, 593 (Tex. App.—El Paso 2019, no pet.) (remanding for new trial on appellate attorney's fees because "the jury could not find zero"). We sustain the nonoperators' fourth issue.

### *Conclusion*

Having concluded that the exculpatory clauses in the JOAs do not apply under these circumstances and the jury's affirmative finding against Ankor on

---

[4] Ankor also argued in its post-submission brief that the exculpatory clause bars the nonoperators' defense of prior material breach under *Crimson Exploration Operating*. 2021 WL 786541, at *3-5. We do not reach that issue because we conclude the exculpatory clause does not apply here.

13

material breach precludes the jury's damages and attorney's fees award in favor of Ankor, we reverse the trial court's judgment and render judgment in favor of the nonoperators, reinstating the jury's award of damages and attorney's fees in the nonoperators' favor. We also remand the cause for a new trial on appellate attorney's fees.

/s/    Frances Bourliot
        Justice

Panel consists of Justices Jewell, Bourliot, and Poissant.

14